**UNITED STATES of America, Plaintiff,**

**and**

**Yonkers Branch—National Association for the Advancement of Colored People, et al., Plaintiff–Intervenors,**

**v.**

**YONKERS BOARD OF EDUCATION, et al., Defendants.**

**No. 80 CIV. 6761(LBS).**

United States District Court, S.D. New York.

Oct. 8, 1997.

Hogan & Hartson, LLP, Washington, DC (Steven J. Routh, John W. Borkowski, of counsel), Banks, Curran & Donoghue, Yonkers, NY (Lawrence W. Thomas, of counsel), for Defendant Yonkers Bd. of Educ.

Sussman, Bergstein & Wotorson, Goshen, New York, for Plaintiff–Intervenors Yonkers Branch—NAACP; Michael H. Sussman, Sheri M. Hatton, of counsel.

Fitzpatrick, Cooper & Clark, North Birmingham, Alabama, for Defendant City of Yonkers; Raymond P. Fitzpatrick, of counsel.

Dennis C. Vacco, Attorney General for the State of New York, New York City, Marion R. Buchbinder, Stephen M. Jacoby, Richard

P. Hamilton, Assistant Attorneys General, for U.S.

## OPINION

SAND, District Judge.

This Opinion and the Order entered this date address and resolve all of the matters relating to the Yonkers Public Schools ("YPS") submitted to this Court following the remand of this case by the Court of Appeals for the Second Circuit. *See United States v. City of Yonkers,* 96 F.3d 600 (2d Cir.1996).[1]

### I. *Liability (Vestiges)*

With respect to issues relating to State[2] liability for contributing to the segregation of the Yonkers Public Schools, the State sought to introduce evidence only on the issue of whether vestiges of segregation, which in 1993 this Court found to remain in the Yonkers Public School System, *United States v. City of Yonkers,* 833 F.Supp. 214 (S.D.N.Y. 1993) ("Vestiges Decision"), continue to be found in that system. (*See* Tr. Tel. Conference of 9/22/97, at 4.)

### A. *Background*

In an opinion dated August 30, 1993, we wrote:

(1) We find that vestiges of segregation remain in the Yonkers Public School system.

(2) We find that many steps are being taken to address these vestiges including teacher training programs, utilization of innovative teaching techniques devised and tested elsewhere, efforts to increase parental involvement, development of magnet school programs, and similar efforts.

(3) We find that the steps being taken in (2) above are inadequate to eradicate ves-

tiges of segregation "root and branch" and must be expanded and implemented in a manner which of necessity will entail the expenditure of additional funds. Not only must teaching techniques and curriculum be reexamined and redesigned to meet these needs, but the physical condition of the YPS must be restored and enhanced if a desegregation program which relies primarily on voluntary selection of magnet schools is to retain its accomplishments to date and attain its ultimate goal of a truly unitary school system.

833 F.Supp. at 225.

The Court did not at that time address "any questions relating to the State's liability for the existence of these conditions nor any question relating to the relative responsibility of the City and State." *Id.*

Since the Vestiges Decision, issues as to the liability of the State were addressed by this Court and by the Court of Appeals which, in an opinion dated September 23, 1996, vacated our dismissal of claims against the State defendants and the U.D.C. and remanded to this Court for further proceedings. *See* 96 F.3d 600.

We see no need to restate the reasoning or conclusions of our Vestiges Decision, full familiarity with which we assume. But that opinion is now over four years old, changes in the demography of the Yonkers school system have occurred (most notably an accelerated influx of Hispanic students, many with limited English proficiency, and the hiring of significant numbers of new teachers), and efforts to address vestiges have been ongoing. Therefore, the question of whether vestiges of segregation still exist in the Yonkers Public School System is one which the State was entirely within its rights to raise. The

---

1. The City of Yonkers and the NAACP have also raised issues relating to State and U.D.C. liability for implementing this Court's Housing Remedy Order. For the reasons set forth *infra* at pp. 693–94, issues relating to a Housing Remedy Order will be deferred pending further submissions by the parties.

2. For the purposes of this Opinion and the annexed Order, unless the context indicates otherwise, the term "State" encompasses the following defendants: The State of New York; The

Board of Regents of the State of New York; Carl T. Hayden; Louise P. Matteoni; Jorge L. Batista; Edward J. Meyer; R. Carlos Carballada; Adelaide L. Sanford; Diane O'Neill McGivern; Saul B. Cohen; James C. Dawson; Robert M. Bennet; Robert M. Johnson; Peter M. Preyor; Anthony S. Bottar; Merryl H. Tisch; Harold O. Levy; and Ena L. Farley, in their official capacities as members of the State Board of Regents; Department of Education of the State of New York; and Richard P. Mills, as Commissioner of Education of the State of New York.

Court permitted the State to conduct discovery on this question and it has now been tried to the Court.

### B. *The Trial*

The State's claim that vestiges of segregation have been eradicated was supported by the introduction into evidence of ten depositions and the testimony of Dr. Theresa Bucci. The thrust of this evidence and of the State's claims are that gaps in achievement scores between minority and majority students may be caused by conditions other than vestiges; that the written evaluations of Yonkers teachers by their superiors do not indicate that there is widespread dissatisfaction with teacher attitudes and proficiency, that certain remedial measures are in effect and are meeting with a degree of success and that the existence of a gap between minority and majority achievement levels is not unique to Yonkers.

This last contention was based on a comparison by way of graph depicting the level of majority and minority test results in Yonkers and four other school districts in New York State. (*See* Trial Ex. A (Streeter Aff.).) These four other districts—Freeport, New York City, New York City Community School districts 15 and 28—were selected by the State because they had overall enrollments of majority and minority students said to parallel those in Yonkers. The thrust of the State's claim was that disparities among the three racial/ethnic groups (Afro-American, Hispanic and non-minority) in terms of the proportion of students in each group who fail to meet the State Reference Point on State mandated Pupil Evaluation Program ("PEP") tests at the third and sixth grade levels was approximately the same in Yonkers and the four districts to which it was compared.

The Yonkers Board of Education ("YBE") countered these claims by updating the evidence which it had presented in the 1993 procedure to demonstrate that standard test results of majority, Black and Hispanic students conducted since 1993 showed a continuation of the gap reflecting lower minority achievement. Disproportionate suspension rates, retentions, dropouts and referrals to special education have also continued to date. As to claims that achievement results may be impacted by factors other than vestiges, the YBE noted that the State had made no effort to overcome the multiple regression analysis utilized in the 1993 proceedings which this Court found demonstrated that race is a statistically significant factor in accounting for the disparity in reading and math scores "even after factoring out other possible causes." 833 F.Supp. at 221.

Testimony introduced by the YBE also reflected the perception of Yonkers school principals and other supervisory personnel that some teachers' attitudes and expectations still too often reflect past stereotypes, *e.g.*, some teachers calling more frequently on majority students seated in the center of the class while giving less attention to minority students.

### C. *Findings as to Vestiges*

The parties are in disagreement with respect to which party has the burden of proof as to the continuation of vestiges. This Court has previously opined that in light of the procedural posture of this case the State bears this burden. We find, however, that it is not necessary to resolve this question because we find that the YBE has clearly demonstrated by a strong preponderance of the evidence that vestiges of segregation currently exist in the Yonkers Public School system. Although staff development programs and other remedial measures are attempting to address these problems, the evidence introduced by the YBE supports the conclusion that vestiges of segregation "root and branch" have not been eradicated.

The fact that lower achievement scores for minority students was a phenomenon present in school districts other than Yonkers was specifically recognized in our 1993 Vestiges Opinion, 833 F.Supp. at 223, and does not alter the conclusions reached in that Opinion. The State offered no evidence which would make more meaningful a comparison between Yonkers and the four other districts whose test results were cited by the State. One does not know, for example, the extent, if at all, the other districts themselves suffer the vestiges of past segregation regardless of

whether or not they were subject to a court decree. One does not know what a multiple regression analysis, which this Court relied on in its 1993 Vestiges determination, would disclose if applied to the raw data proffered as to the four other districts.

In sum, we adopt and reaffirm the findings and conclusions of our Vestiges Decision. While remedial measures have been adopted on a limited scale because of funding constraints, they have not been adequate to eradicate vestiges of segregation.

■ Further, we find that a causal relationship exists between the conduct of the State as reflected in the findings of fact contained in our prior decision on State liability, which findings of fact were affirmed by the Court of Appeals, 96 F.3d 600, and the existence of vestiges of segregation in the YPS. The continuing vestiges of segregation in the YPS are traceable to the prior dual school system that was established and maintained in substantial part by acts or omissions of the State. The State is, therefore, liable for eliminating segregation and its vestiges in YPS and therefore must fund a remedy to accomplish that goal.

## II. *The EEOA Claims*

■ Following the remand of the Court of Appeals, we have considered whether the denial of equal educational opportunities may be remedied by a method or combination of methods that does not include busing. *See* 96 F.3d at 621. Although the making of such

a finding may present significant problems in some contexts, it is clear to this Court, writing eleven years after initial adoption of a remedy order vis-a-vis the City and YBE and having the benefit of the experience of the intervening years, that busing was and remains an essential component of the remedy order. As we noted in our Vestiges Decision the swift "smooth and peaceful" desegregation which took place in the YPS within less than a year of the issuance of the initial remedy order (Educational Improvement Plan I ("EIP I")), "was brought about by instituting a voluntary magnet school program, including procedures for school selection by parents, busing and other similar measures." 833 F.Supp. at 216. No one familiar with the history of the YPS can seriously argue that busing was not a critical component of EIP I when it was adopted in 1986 and remains so today. In fashioning a remedy order hereunder, the Court proceeded in the light of this finding.

The Court finds, pursuant to 20 U.S.C. § 1712, that the remedy called for in this Opinion and the Order seeks to impose and imposes only such remedies as are essential to correct particular demands of equal educational opportunity and equal protection of the laws. *See* 20 U.S.C. § 1712 (1988). Indeed, as noted herein, the EIP II provisions are specifically crafted to deal with vestiges of segregation remaining in the YPS.

We set forth in the margin the text of 20 U.S.C. § 1713 [3] which provides that in adopt-

---

3. The statute provides as follows:

§ 1713. Priority of remedies

In formulating a remedy for a denial of equal educational opportunity or a denial of the equal protection of the laws, which may involve directly or indirectly the transportation of students, a court, department, or agency of the United States shall consider and make specific findings on the efficacy in correcting such denial of the following remedies and shall require implementation of the first of the remedies set out below, or of the first combination thereof which would remedy such denial:

(a) assigning students to the schools closest to their places of residence which provide the appropriate grade level and type of education for such students, taking into account school capacities and natural physical barriers;

(b) assigning students to the schools closest to their places of residence which provide

the appropriate grade level and type of education for such students, taking into account only school capacities;

(c) permitting students to transfer from a school in which a majority of the students are of their race, color, or national origin to a school in which a minority of students are of their race, color, or national origin;

(d) the creation or revision of attendance zones or grade structures without requiring transportation beyond that described in section 1714 of this title;

(e) the construction of new schools or the closing of inferior schools;

(f) the construction or establishment of magnet schools; or

(g) the development and implementation of any other plan which is educationally sound and administratively feasible, subject to the provisions of sections 1714 and 1715 of this title.

ing any remedy pursuant to the EEOA which may involve directly or indirectly the transportation of students, a court shall consider and make specific findings on the efficacy in correcting such denial of the enumerated remedies and calls for a prioritization of such remedies.

■ Although the YBE contends that § 1713 is inapplicable since it does not directly involve the transportation of students, (YBE's Proposed Findings of Fact at 59), the Court finds that it indirectly involves such transportation since it seeks to implement earlier Court orders which do call for student transportation. However, § 1713 provides no impediment to the Order entered herewith because the Court further finds that the remedies set forth in §§ 1713(a)–(e), have been utilized to the extent practicable in the YPS and that implementation of such remedies alone without the further provisions of EIP I and EIP II would not be efficacious in correcting the denials of equal educational opportunity and equal protection present in this case. Moreover, EIP II has been voluntarily proposed by the YBE, the appropriate educational agency pursuant to 20 U.S.C. § 1716. Whatever contrary views as to the voluntary nature of the YBE's plans this Court previously entertained, *See* 888 F.Supp. 591, 595 n. 7 (S.D.N.Y.1995), are inapposite in the present posture of these proceedings.

■ Recognizing that the Court of Appeals already determined that the EEOA is applicable and would subject the State to liability with respect to vestiges of segregation, 96 F.3d at 619–21, the State urges that this question

> should be revisited in light of the Supreme Court's subsequent decision in *City of Boerne v. P.F. Flores,* —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), explicating the limits of Congressional enforcement powers under § 5 of the Fourteenth Amendment, and the EEOA should be declared unconstitutional and invalid.

(State Defs.' Proposed Findings of Fact at 38.)

The State argues that *Boerne* stands for the proposition that Congress has not been empowered by § 5 of the Fourteenth Amendment to "making a substantive change in the governing law," [4] and that the EEOA alters substantial law by doing away with the intent element which must be shown to substantiate an equal protection claim. Further, the State contends that in adopting the EEOA "Congress altered the substance of constitutional law by imposing this absolute, vicarious supervisory liability on each state without regard to the relationship established by each state itself between that state, its officials, and local educational authorities." (State Defs.' Proposed Findings of Fact at 42.)

The Court finds the claim that EEOA is unconstitutional to be without merit. *Boerne* involved an attempt by Congress in the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb *et seq.,* to overturn a Supreme Court decision relating to the tests to be applied in determining the constitutionality of generally applicable laws said to impinge on religious practices. The EEOA was adopted pursuant to a Congressional declaration of policy (§ 1701) and pursuant to Congressional finding (§ 1702) to address the subject of transportation of students in light of the failure of the courts to establish clear and uniform standards. Unlike *Boerne* which was designed to reverse a specific Supreme Court determination, Congress in the EEOA was deferential to the courts stating "that the provisions of this chapter are not intended to modify or diminish the authority of the courts of the United States to enforce fully the fifth and fourteenth amendments to the Constitution of the United States." 20 U.S.C. § 1702(b).

The Court finds no basis for the claim that EEOA is unconstitutional as contended by the State. (State Defs.' Proposed Findings of Fact at 46).

The State asks that the Court also revisit the determination that it is subject to suit

---

**4.** *See City of Boerne v. P.F. Flores,* —— U.S. ——, ——, 117 S.Ct. 2157, 2164, 138 L.Ed.2d 624 (1997).

under Title VI. 880 F.Supp. at 232–33. The Court of Appeals did not address this issue and we saw no reason to disturb our prior conclusions.

### III. *Housing Issues*

There are three respects in which housing related issues impact on the presence of vestiges in the YPS and steps for their eradication.

### A. *School Remedy vis-a-vis the State*

The facts establishing the State's knowledge that the U.D.C. was building housing in Yonkers which perpetuated and exacerbated the pattern of racial segregation in Yonkers have been fully established in prior proceedings *See, e.g.,* 96 F.3d at 608. The interrelationship between housing and school segregation has also been adequately demonstrated. In concluding that the State is liable for vestiges of segregation in the YPS and in formulating a further school remedy order vis-a-vis the State, no further proceedings or findings are required. Indeed, the YBE advances no proposals specifically directed at housing issues.

### B. *Housing Remedy vis-a-vis the State*

The City has filed an offer of proof seeking to introduce evidence concerning the status of the housing remedy order now in place and the need for State funding to implement the creation of integrative housing opportunities in Yonkers. The City's proposed order would call upon the U.D.C. to submit for consideration "a plan for the provision of resources to further completion of the requirements of the Housing Remedy Order." (Def. City of Yonkers' Post–Hr'g Mem. at 25.) The City agreed, however, with the suggestion of the Court that the issue of a housing remedy order directed to the State be deferred so as not to delay entry of a school remedy order. (*Id.*) The time exigencies with respect to a school remedy, *i.e.,* the

need for immediate action if corrective measures are to be in place for the next school year, and the issues discussed below, have led this Court to go forward with a school remedy order while briefly holding housing remedy order issues in abeyance pending further submissions by the parties.

### C. *Housing Remedy vis-a-vis U.D.C.*

The Court of Appeals reversed the Court's dismissal of this case as against the U.D.C. holding that its conduct rendered it liable and remanded for a redetermination of whether the U.D.C.'s conduct constituted a "continuing wrong" so that the action against the U.D.C. was not barred by the statute of limitations. The NAACP, which brought the action against the U.D.C., urges this Court to find that the U.D.C. remains liable and proposes an order which would require the U.D.C. within sixty days to submit a plan "which will assist in the creation of affordable housing in areas outside those of minority concentration." (NAACP's Post–Hr'g Mem. at 15.)

With respect to items B. and C. above, the Court finds that it needs more input from the parties. Some of the issues which the Court wishes to explore, touching upon both liability and remedy, are the following:

(1.) As to the U.D.C., what was its status after 1973 and is its present status? What resources, fiscal and otherwise are available to the U.D.C. today? If a final monetary judgment is entered against the U.D.C., from what funds is the judgment paid?[5]

(2.) As a result of years of agonized efforts there is in place a housing remedy order which is in the process of implementation. The day to day administration of this remedy order has been largely turned over, at its request, to the City with a diminishing degree of oversight by the Court appointed Housing Monitor. To what extent if any do the proponents of a housing remedy order,

---

**5.** The State begins to address this issue in its Reply Memorandum as follows:

> Because the UDC was taken out of the housing business, it would not have funds available for new housing activities and it would not have staff with the expertise necessary to plan housing activities. The proposal that

> UDC should now plan housing assistance is thus meaningless. Furthermore, as the UDC is not the State, 880 F.Supp. at 243–44, the notion that UDC could plan State assistance is similarly unfounded.

(State Defs.' Reply Mem. at 22 n. 7.)

embodying State or U.D.C. participation, envisage a reopening of this order?

The Court will initiate a telephone conference among all of the parties as early as possible to establish a schedule for further inquiry into housing remedy issues.

## IV. *Remedy*

### A. *EIP I*

Questions concerning the provision of a remedy to eradicate vestiges of segregation center on two Education Improvement Plans. EIP I is embodied in this Court's initial School Remedy Order of May 13, 1986 and has been implemented by the YBE since that date with funds provided by the City, and miscellaneous State and private foundation grants. The City with the support of the NAACP and the YBE sought an order requiring the State to provide financial support sufficient to enable EIP I to be implemented fully. On June 9, 1997, adopting a recommendation of some of the parties, this Court ordered its Monitor, Dr. Joseph M. Pastore, Jr. to "report and recommend to the Court what steps, if any, need be taken to implement fully EIP I including, but not limited to, the proportion of EIP I related costs which the State defendants should bear." Dr. Pastore's Advisory Opinion on the Matter of How the Financial Burden Should be Distributed to Implement the Court–Ordered Educational Improvement Plan is annexed hereto as Appendix I.

 No party sought oral argument with respect to the Monitor's Advisory Opinion but all parties filed briefs on the issues addressed therein. The State's primary objection is that:

> because the evidence shows that, in part due to the generous funding voluntarily provided by the State, the provisions of EIP I have been fully implemented and the goals of that Order fully realized, the controlling decisions require that this Court relinquish jurisdiction over the Education remedy.

(State's Objections to Monitor's Advisory Op. of 8/14/97, at 1.)

The claim that EIP I's goals have been fully realized is based on an overly narrow view of that Order and factual misconceptions. While EIP I placed major emphasis on the assignment of students and school district reorganization, it was not limited to the physical placement of students but also addressed steps to achieve a unitary status for the YPS. Thus, the 1993 Vestiges proceeding was not the first occasion on which the YBE and NAACP took the position that:

> the placement of majority and minority students and staff in the same school buildings in numbers proximate to their incidence in the general school population, so that schools are no longer racially identifiable, is but the first step to achieving a truly unitary school system. Such a unitary school system is in place only when students, regardless of race, have similar educational opportunities and experiences.

833 F.Supp. at 216.

EIP I adopted in 1986 § K included the following:

> Assurances. The Board shall establish a comprehensive staff development program which will be a component of its ongoing in-service program for teachers and administrators and will address areas such as racial attitudes, student discipline procedures, academic achievement and performance goals, teaching in a diverse racial/ethnic environment, and integration goals.

(Monitor's Proceedings YBE Ex. 1A.) [6]

In advancing its claim that this goal of EIP I was fulfilled, the State cites the fact that the YBE report for the year 1989–90 reported that "Implementation of the Educational Improvement Plan" was one of five major components of the district's staff development and in-service programs. (State's Objections at 5.) But this contention ignores the overwhelming evidence that the district, because of lack of funding, does not have an adequate staff development program to deal with such matters as teacher's attitudes and expectations and other matters which are

---

**6.** All exhibits introduced at the Monitor's proceedings have been received in evidence before this Court. (*See* Trial Tr. at 27.)

said to contribute significantly to lower achievement results of minority children.

The claim that EIP I's goals have already been fulfilled is rejected.

Another State objection is that EIP I has been funded entirely by the State. This issue raises the question fully addressed in the Monitor's Advisory Opinion, (App. A at 14–18), of the treatment to be accorded the State's allocation of $29.5 million for magnet program grants. Dr. Pastore concluded, based on the evidence presented before him, that the recent level of magnet program funding provided by the State serves in part as an equity adjustment and in part as a response to urgings by Yonkers representatives to support desegregation costs in Yonkers. (*Id.* at 18.) The State objects that this conclusion is based upon impermissible speculation as to legislative intent.

But the evidence before the Monitor, especially that of Claire Eatz, principal budget examiner of the New York State Division of Budget, cited by Dr. Pastore, fully supports his characterization of State magnet aid and the treatment accorded such aid in the formula which he recommends. The issue is not one of the subjective intent of the legislature but rather what the objective facts show to be the effect of the State funding, the method by which the amount of funding is determined, the lack of any assurance of continuity and of any specific relevant direction as to the application of such funding.

We have reviewed the other State objections and find them to be without merit.

We adopt and approve the Recommendations in the Advisory Opinion insofar as they apply to implementation of EIP I and proceed to a consideration of EIP II.

## B. *EIP II*

■ The YBE has promulgated an Educational Improvement Plan, (EIP II Ex. 1A), adopted by the Board in September 1997. In its Foreword to the Plan, signed by the Superintendent of Schools Reginald Marra,

and President of the Board of Trustees, Elaine Tsu, it is stated:

> EIP II represents the best thinking of hundreds of people in our educational community on the elimination of vestiges of segregation. The plan was developed by trustees, administrators, teachers, parents, students and community representatives. To develop this plan we have sought the advise of noted educators and have evaluated research from urban centers throughout this country.

(EIP II Ex. 1a at 1.) The Plan states that it has

> one major goal, which focuses on the equity of student outcomes. It is: To eliminate all vestiges of segregation in the Yonkers Public Schools (thereby eliminating gaps in achievement and other learning outcomes).

(*Id.*) [7]

EIP II identifies specific vestiges of segregation which have previously been cited and purports to address them directly as follows:

> The Vestiges
>
> In achieving the goal of eliminating vestiges of segregation, EIP II focuses on vestiges and the evidence of vestiges to propose specific remedy actions to remove the vestige.
>
> 1. *Vestige:* "Within many schools in Yonkers, there remains racial and ethnic segregation of students among various levels of courses, programs, classes and in-class grouping, which affects the quality and type of education provided to children of different racial and ethnic groups." ...
> "The implementation of EIP I has not addressed or alleviated many of the conditions of inequality that were fostered by the racially dual system of education in Yonkers, such as racially disparate attitudes and expectations of teachers and administrators; teaching methods that support effective instruction primarily for *middle* or *upper middle* class white students in homogeneous classrooms; curriculum that is neither multicultural nor

---

7. A further description of EIP II is set forth in the Order which immediately follows this Opinion and sets forth in greater detail the steps to be

taken in an effort to eradicate vestiges of segregation in the YPS.

aligned to the goals and objectives of the desegregating school system; and a lack of adequate services for students with limited English proficiency."

*Action Plan:* The alignment of a curriculum, assessments and teaching methodology with State and National Standards, and access to those supports that will enable minority students to succeed in courses using high level curriculum.

*Action Plan:* Providing continuing professional development that will equip all teachers with the knowledge and skills needed to teach to an increasingly diverse student population with a variety of educational, language, social, and health needs. Developing appropriate time for staff development through summer seminars and classes on teaching and learning and those specific areas relevant to eliminating vestiges. Providing time and resources during the school year; for in-school staff development and development of a strong staff supervision and evaluation component to determine the effectiveness of staff development. Provide adequate and appropriate materials and equipment to each classroom.

2. *Vestige:* "The implementation of EIP I has not addressed or alleviated many of the conditions of inequality that were fostered by the racially dual system of education in Yonkers, such as pupil personnel services, that are particularly important to the effective education of minority children."

"The advent of desegregation has resulted in a greater need for the services of social workers and guidance counsellors. Ironically despite this greater need, the ratio of such support staff to students has decreased. Where once there was a social worker assigned to each school building, this is no longer the case."

"The implementation of EIP I itself has given rise to a number of problems that must be addressed to ensure effective education in a desegregated setting, such as the increased difficulty of obtaining parental involvement in schools that, by necessity, no longer serve populations drawn ex-clusively from surrounding, segregated neighborhoods."

*Action Plan:* The restructuring of schools to place greater focus on the needs of minority students through more individual attention to students, smaller class and school size, increased counseling and increased parent outreach to minority families.

3. *Vestige:* "Although EIP I has been successful to date in maintaining desegregated school enrollments, its ability to support continued voluntary desegregative movements of students within Yonkers and its ability to attract enough middle class and non minority students to provide for meaningful desegregation in the future will be seriously undermined unless the magnet school programs are fully implemented and the overall quality of education in the system is improved."

"Not only must teaching techniques and curriculum be reexamined and redesigned to meet these needs, but the physical condition of the YPS must be restored and enhanced if a desegregation program which relies primarily on voluntary selection of magnet schools is to retain its accomplishments to date and attain its ultimate goal of a truly unitary school system." (1993).

*Action Plan:* The court-ordered desegregation plan in Yonkers depends heavily on parental choice. Experience in communities throughout the United States demonstrates, however, that even where such programs work well, initially, follow-up, review, planning, adjustment and reinforcement are critical to achieving long-range success. EIP II includes such an effort. It is important that the district needs to further examine its magnet programs to determine those successful concepts or practices to be replicated and those to be eliminated or revised. The success of the Yonkers desegregation plan (EIP II) depends on parents' belief in the school system and its ability to educate their children to their highest level of achievement. As this is a school district of choice, parents must believe that this level of education can be achieved at each of the dis-

trict's schools and that their choice is one of enhanced program, not attainment of basic skill. This will be in part accomplished through the above action plan and through the renovation and enhancement of the physical plant, but also through the evaluation of all of our programs and through ongoing two-way communication with our community.

(EIP II at 3–5.)

According to its proponents, the function of EIP II is to provide a framework for a standard based accountability for the YPS. Ramon C. Cortines, testifying for the YBE as an expert on standard based education and desegregation, stated that this technique was effectively utilized in three school districts which he had headed which were undergoing desegregation: Pasadena, San Diego and San Francisco. His testimony, together with that of Dr. Gladys Pack, chief coordinator for the YPS of EIP II, and the deposition testimony of Dr. Linda Darling–Hammond, supported the contention of the YBE that EIP II embodied the latest thinking and experience in informed educational circles of how to deal with vestiges of segregation in an urban school district.

All of the YBE's witnesses emphasized that EIP II was a broad framework which required additional planning on a school by school basis. Some of its provisions, such as development of a district wide core curriculum consistent with State and national achievement standards, will clearly require additional time and study. A school by school analysis of all aspects of EIP II will be required.

EIP II is the framework for an eight year program with the phasing in of individual schools over a five year period. The selection of which schools would be phased in and when this was to occur was in large part a function of physical conditions. EIP II calls for reduced class sizes and an increase in support staff (*e.g.*, social workers, staff developers, etc.). Both of these programs entail space considerations. The Plan does state, however, that

[d]uring the phase-in period all schools will align their staff development and student support activities with those of EIP II to the extent possible to allow for a more coordinated plan.

(Trial Ex. 1a at 20.)

Prior to submission to the Court, the Plan was widely disseminated in Yonkers and has been the subject of various community meetings. We are told the community response has been favorable.

Superintendent Marra testified that the next step following court approval would be a 12–14 week period of intensive planning so that the individual schools would have a program to start implementing the plan in September 1998.[8] This planning would require the retaining of planning and engineering consultants and funds to pay teachers and administrators to come in on Saturdays and work after school. During this 12–14 week period, work would be done on curriculum and on recruitment. He estimated that it would cost $450,000 to start the planning for the eight schools to be phased in during the first year and that the current school budget does not contain funds available for that purpose. (Trial Tr. at 989–90.) This cost estimate was not challenged by the State.

The criticisms to EIP II expressed by the State's expert witnesses, Dr. Theresa Bucci and Jeanette Canady are principally directed to the fact that EIP II is lacking in needed detail or does not make sufficient use of helpful resource material made available by the State. Thus Dr. Bucci identified several factors which she believed were relevant to increasing student achievement.

a) Lack of ongoing daily assessment of individual students by their teachers.

b) Non-alignment of curriculum.

c) Not enough intensive exposure of bilingual students to English.

d) Development of strategies for taking tests, especially for the lower grades.

e) Dealing with student mobility.

---

8. The State's witness, Dr. Bucci, testified that several months were necessary to develop an effective individual school implementation budget. (Trial Tr. at 144–45.)

f) Need to measure attendance and enforce attendance requirements.

(*Id.* at 71.)

Dr. Bucci agreed that some of these causes of student underachievement exist in the Yonkers Public Schools and are not being adequately addressed. (*Id.* at 72.)

But in fact EIP II contemplates dealing with all of the causes of underachievement which Dr. Bucci cited. Smaller class sizes and staff training certainly address the need for greater teacher assessment of individual students. Adoption of a district wide core curriculum will help alleviate the adverse impact of student mobility within the district. Enhancement of training for Limited English Proficiency students and enhancement of support personnel to deal with absenteeism are also directly addressed in EIP II.

Other objections to EIP II have been, we believe, adequately addressed in what has gone before. It is not the case that the YPS now have available all that is required to implement needed programs to eradicate vestiges of segregation. Where special grants have been received from private foundations which have supported specific educational enhancements, like furnishing reading aides, the results achieved have been promising. The basic premises that all children can learn and that the critical factor in evaluating a school system is the achievement levels of its students, is recognized and would be operative pursuant to EIP II.

The State's claim that EIP II calls for the YBE to do things which it would be required to do absent a history of past segregation— *e.g.,* meeting state wide testing levels or adoption of a curriculum—misses the point. Although, of course, the teaching enhancements envisioned by EIP II will benefit majority as well as minority students, EIP II is directed specifically toward eradication of vestiges of segregation.

The Court finds that the EIP II plan proposed by the YBE provides the framework for an appropriate remedial plan tailored to the task of eliminating the vestiges of segregation in YPS to the extent practicable.

## V. *Implementation*

### *The Planning Process—The Next Fourteen Weeks*

There is a compelling need to undertake forthwith the further development of EIP II so that implementation of the remedial measures of that plan may begin in September 1998. Indeed, it would be tragic if another school year were to go by without significant additional measures being taken to address the vestiges of segregation found in the YPS. The cost of such planning estimated by Superintendent Marra to be $450,000 is relatively modest when compared to other costs of this litigation. In the Court's order, entered this day, we have directed the State to participate fully in this planning process and to defray its costs.

The State has continued to avoid any meaningful involvement in the efforts to eradicate vestiges[9] despite the general "hands on" approach of the State Education Department with respect to other matters concerning education. In essence the State has adhered to the abstention policy fully detailed in the findings of fact set forth in our 1995 opinion (880 F.Supp. at 218–24). The State advances a number of reasons for this posture: the matter is in litigation; the YBE's settlement offer is unreasonable; vestiges do not exist; the State has no liability and adequately discharges its overall obligations by the funding grants to Yonkers, especially its magnet school grants. Thus the State has confined its role to that of an aggressive litigant, seeking to avail itself of all opportunities for delay and resisting all exhortations that, in the discharge of its obligations to the children, it take a more active and positive role.

In light of the determinations made by the Court of Appeals with respect to the liability

---

9. Superintendent of Schools, Reginald Marra, testified as follows:

Q. You're familiar with the vestiges decision that the court issued in 1993. Is that correct?
A. That's correct.
Q. Has anyone from the State Education Department ever contacted you or the schools about that decision?

A. No.
Q. To what extent has anyone in the State Education Department ever undertaken to evaluate the conditions in the Yonkers Public Schools to see whether they're consistent or inconsistent with the statements in that decision?
A. Not that I am aware of.
(Trial Tr. at 972–73.)

of the State and the findings of this Court herein, it would be appropriate for the State, without prejudice to whatever rights for appellate review which it may seek to preserve, to cooperate fully with the YBE and Superintendent Marra in moving EIP II forward. Educators rather than litigators should dominate the planning process.

Having said all this, however, we recognize that the State may refuse to participate either intellectually or fiscally in this next stage of implementing EIP II. However, even if this Court's orders vis-a-vis the State are stayed by an appellate court, the planning process should go forward. As the Court stated in its Opinion of July 10, 1992 and repeated in its vestiges Opinion:

> we put all parties on notice that if vestiges of segregation are found to exist and to be inadequately addressed, the Court will consider what action is appropriate and will not be limited to the relief sought by the YBE and NAACP against the State.

833 F.Supp. at 217.

In the event that State funding for the $450,000 planning process is not forthcoming (*e.g.*, by virtue of an appellate court stay), such funds are to be furnished by the City of Yonkers which is of course clearly liable by virtue of prior court decisions.[10] The planning should be based on the assumption that the State will ultimately contribute to the costs of EIP II along the general lines set forth in Dr. Pastore's Advisory Opinion and in amounts to be determined pursuant to the provisions of the accompanying Order. Payment by the City of the entire cost of this planning process would be without prejudice to the City's right to seek refund of some or all of such funds from the State fund when whatever obstacle to State participation has been removed.

The paramount concern should be to expedite as fully and expeditiously as possible the eradication of all vestiges of segregation remaining in the YPS.

The Court has entered an Order which follows this Opinion.

---

**10.** During the 1993 vestiges hearing the City took the position that the YBE and NAACP had not proven the existence of vestiges which the City was due to remediate under applicable federal law and presently asserts that it has not waived this position. (Def. City of Yonkers' Post–Hr'g Mem. at 3.) We reject the concept that vestiges require eradication if State funds are available for this purpose but may be tolerated if State funds are not forthcoming.

## APPENDIX A

### Monitor's Advisory Opinion

**MONITOR'S ADVISORY OPINION ON THE MATTER OF HOW THE FINANCIAL BURDEN SHOULD BE DISTRIBUTED TO IMPLEMENT THE COURT–ORDERED EDUCATIONAL IMPROVEMENT PLAN (EIP I).**

**Appearances:**

**For the Yonkers Board of Education and the City of Yonkers:** Raymond P. Fitzpatrick, Jr., Esq.: Attorney for the City Lawrence Thomas, Esq.; Attorney for the YBOE Reginald Marra; Superintendent of the Yonkers Public Schools Frank Lutz; Executive Director of Finance for the Yonkers Public Schools James LaPerche; Finance Commissioner for the City of Yonkers Victor Evans; Principal, Ingraham Planning Associates Lisa Perfetti; Senior Manager, Arthur Andersen Consulting

**For the United States:** Lisa Evans, Esq.

**For the NAACP:** Michael H. Sussman, Esq.

**For the YFT:** John J. Naun, Esq. Paul Janice, Esq.

**For State of New York:** Richard P. Hamilton, Esq.; Assistant Attorney General Joel Graber, Esq.; Assistant Attorney General Gina Cuneo; Deputy Executive of the New York State Emergency Financial Control Board for the City of Yonkers Claire Eatz; Principal Budget Examiner, Division of the Budget for the State of New York

A hearing on the above matter was held on July 14, 16, and 17, 1997 in Yonkers, New York before Joseph M. Pastore, Jr., Court-appointed Monitor *U.S. v. Yonkers.* All parties were provided an opportunity to present witnesses, offer testimony and argument, and to engage cross-examination. A transcript of all proceedings was taken with copies distributed on July 29, 1997.

## Background

In the wake of the Court of Appeals decision, *United States v. City of Yonkers,* 96 F.3d 600 (2d Cir.1996) and in the absence of any stay pending a ruling by the Supreme Court of the United States on the State's petition for *certiorari,* and in response to a motion by the City of Yonkers with the support of the NAACP and YBOE petitioning the U.S. District Court to issue an order requiring the State to provide financial relief sufficient to further the EIP I ordered by the Court in 1986. 635 F.Supp. 1538, the Court, on June 9, 1997, ordered that the Monitor "report and recommend to the Court what steps, if any, need be taken to implement fully EIP I including, but not limited to, the proportion of EIP I related costs which the State Defendants should bear." The Order was specific in its direction not to consider EIP II or vestige-related costs which are currently not ordered and subject to a scheduled review by the Court.

## Issues

As a result of a June 26, 1997 telephone conference with all parties, it was determined that the questions and issues before the Monitor, and in response to the Order cited above, should include:

a) What are the Court-ordered provisions of EIP I?

b) To what extent has EIP I been implemented and what is yet to be implemented?

c) What are the costs of EIP I, both funded and unfunded?

d) What are the funding sources for EIP I?

e) How shall the financial burden for implementing EIP I be distributed in the future?

## Contentions of the Parties

Contentions were offered by the City, YBOE, NAACP, and the State.

***Contentions of the City.*** The City contends the following:

(1) The City has borne, since 1986, the full cost of EIP I except to the extent that State law provides relief for certain education related expenditures such as transportation and capital improvements.

(2) The City contends that it is financially unable to fully fund the cost of EIP I. It offers as evidence:

 a) The fact that the City continues to operate under the supervision of the State Emergency Financial Control Board;

 b) that the City imposed taxes at its Constitutional limit in fiscal years '86, '87, and '88 and has been within approximately $40 million (or approximately 10% of its total budget to include education) of its tax limit in fiscal years '96 and '97 (City Exh. 1);

 c) that the City has imposed annual tax increases since fiscal year 1986 ranging from 3.75% to 10.2% with an average increase of 6.3% (City Exh. 1);

 d) that the City has eliminated over 200 City, non-educational positions (approximately a 10% reduction) in the past decade with 40% of those cuts falling in fiscal 1997 (City Exh. 1);

 e) that the City's budgetary allocation to education has been, since 1993, in excess of all other City operating costs (City Exh. 1);

 f) and, that the City's assessed valuation for tax purposes has decreased nearly $135 million since 1989 resulting in a nearly $175 million cumulative loss of taxing power (City Exh. 1).

(3) The City contends that the State has not borne an equitable share of the total cost of education in Yonkers to include the cost of EIP I and offers the following evidence to support its contention:

 a) When compared to other "Big Five" city (the "Big Five" include Yonkers, Syracuse, Rochester, Buffalo, and New York City) school districts in New York State, other than New

York City, Yonkers currently receives the lowest total per student aid—approximately 65% of the next lowest (Rochester) and 50% of the district with the highest total per student State aid (Buffalo), (City Exh. 2, p. 8).

b) When compared to the most comparable City school district in New York State, Syracuse (both Syracuse and Yonkers have approximately 23,000 students), Yonkers has received 58% to 76% of aid comparable to Syracuse throughout the 1985–1997 time period resulting in a total of nearly $400 million more State aid provided to Syracuse relative to Yonkers during that same time period (City Exh. 2, p. 1).

c) Given (3)(a) and (b) above, the City of Yonkers has had to provide approximately three (3) times the amount of aid the City of Syracuse provides to education (City Exh. 2, pp. 4 and 5), despite the comparable size of each district.

(4) The City contends that the inequities cited in (1), (2), and (3) above derive from a State aid to education funding formula which is inequitable. The City further contends that the State has acknowledged flaws in the funding formula through public statements made by the highest State officials and through an attempt, in 1993–94, to reformulate the basis for granting formula driven aid to school districts throughout the State. Such reformulation would ordinarily result in nearly $30 million more dollars to Yonkers, but financial constraints within the State imposed a "transition cap" on aid adjustments, thereby restricting a calculated $30 million aid adjustment to Yonkers to approximately $10 million. Thus, the City contends, the State has failed to provide approximately $20 million in annual aid to Yonkers Schools—aid which the State's reconstituted aid formula calls for, but which is not paid because of the State imposed transition cap (see City Exh. 3, p. 1; also 7–17 Tr., pp. 34–35 [Eatz] and 7–16 Tr., pp. 46–47 [Perfetti]).[1]

*Contentions of the YBOE.* The YBOE contends the following:

(1) The YBOE echoes City contentions with respect to funding inequities in State aid to education. In particular, the YBOE cited the "transition cap" which limits the City to $10 million of the $30 million aid Yonkers would be eligible for under a 1993–94 revised aid formula, but for the cap. The YBOE also noted that during the period of 1988–93, State education revenue ranges to Buffalo, Rochester, Syracuse, and New York City were 66%–72%, 49%–52%, 54%–62%, and 39%–43%, respectively, while Yonkers' State education revenue ranged from 31%–37% during that same period (YBOE Exh. 15).

(2) The YBOE contends that current City and State funding is inadequate to cover the cost of State mandated educational programs *and* Court–Ordered EIP I programs. The YBOE noted that approximately $5.6 million in EIP I mandated programs are currently unfunded and therefore not implemented for lack of funding (see YBOE Exh. 3 and 7–14 Tr., pp. 172–173 [Lutz]).

(3) The YBOE contends that the direct cost of currently implemented EIP I mandates approximate $44 million with

---

1. New York State aid to education is predicated on essentially two sources: formula aid and categorical aid. Formula aid supports basic, State mandated educational programs, is strictly determined and reflective of personal wealth and real estate values as measured within each school district. Since 1993–94, formula-based aid has included a "transition cap" intended to respond to equity issues emanating from the basic aid formula; actual payment of the transition adjustment has been constrained since its inception by a "transition cap" imposed as a result of State budgetary limitations. Categorical aid is discretionary, decided annually through State budgetary appropriations, and targeted to specific programs and services (e.g., technology, magnet programs, transportation, capital expenditures....). In 1996–97, Yonkers received approximately $39 million in formula aid and $44 million in categorical aid from the State.

an additional $4.8 million estimated as the indirect cost of EIP I (YBOE Exh. 3).

(4) The YBOE further contends and cautions, however, that EIP I related costs are not mutually exclusive *vis a vis* the District's base budget and, therefore, such costs are not strictly limited to specific EIP I mandated provisions and, as such, are not easily identified (7–14 Tr. pp. 133–134 [Lutz]).

(5) The YBOE contends it requires the equivalent of 39 more classrooms or approximately two new schools costing approximately $25 million (exclusive of land) in order to comply with EIP I standards of equity to include sufficient space for the operation of Court-ordered magnet programs not yet fully implemented (YBOE Exhibits 10 and 11; 7–14 Tr., pp. 12–23 [V. Evans]).

(6) The YBOE contends it requires space to accommodate 700 pre-K (EIP I mandates a full day Pre–K program) children, now on a waiting list because of insufficient space, at an approximate cost of $15 million (exclusive of any land cost) (7–16 Tr. pp. 23–24 [V. Evans]).

(7) The YBOE contends that it is constrained, by insufficient funding, in its attempt to fully implement EIP I mandates and it joins the City's contention that an incremental $50 million, divided between operating and capital costs, is needed to go forward with compliance.

**Contentions of the NAACP.** The NAACP contends:

(1) EIP I, at times and by some, has been seen erroneously only as a re-assignment order—essentially an order designed to achieve racial balance in the Yonkers Public Schools. The NAACP contends that the Order is more than that and reaches to the incorporation of such educational initiatives as magnet programs, pre-K programs, and alternative education programs, all intended to be delivered in a setting which affords adequate physical facilities and a qualified, resourced, and dedicated staff. The NAACP contends that, for lack of funds at least, such programming, facilities, and staff have not yet been fully attained in the Yonkers Public Schools.

(2) The NAACP contends that it has argued all along that EIP I could not be funded adequately without incremental State assistance and that the failure to achieve such funding has resulted in a disproportionate burden on the taxpayers and citizens of Yonkers—many of whom are the very African–American and Hispanic/Latino families who are to benefit from the 1986 Order.

(3) The NAACP contends that the City's and State's "ability to pay" should not be an issue in this case and that both parties should be required to provide sufficient funding to implement the Court-ordered EIP I.

(4) The NAACP contends that the State should be required to fund $35 million of the annual operating costs of EIP I and half of the remaining capital costs of EIP I beyond the State's ordinary reimbursement, for State approved capital investment of approximately 39%.

**Contentions of the State.** The State contends the following:

(1) Given the fact that the Yonkers Public Schools are in compliance, and have been for some years, with the racial composition standards ordered by the Court in 1986, the State contends that EIP I is "simply done" (7–17 Tr., pp. 164–166 [Hamilton]).

(2) The State contends that the City of Yonkers does have additional taxing capacity to shoulder Court-ordered costs (State Exh. 3, p. 5 and State Exh. 6; also 7–17 Tr., pp. 76–77 [Cuneo]).

(3) The State contends that the State's formula driven aid is predicated on a longstanding principle of wealth redistribution such that the wealthier school districts receive less aid for education

than poorer districts. Given personal wealth and property values in Yonkers, Yonkers is measured as a wealthier school district than the comparably sized, but poorer, Syracuse school district—hence the formula aid difference.

(4) The State contends that the State has assumed an increasing proportional share of the educational budget for the City of Yonkers since 1985–86 (State Exh. 7).

(5) The State contends that, contrary to City and YBOE representations, the State has contributed to the cost of EIP I, by providing aid not only to State mandated programs, but to Court-ordered capital improvements, transportation, and magnet programs. As for the latter, the State contends that magnet program aid to Yonkers has grown from $3.5 million in the year prior to the 1986 Order to $6 million in the first year of the Order to $29.5 million in 1996–97 resulting in magnet program contributions of approximately $220 million since the 1986 Order (State Exh. 8).

(6) The State contends that, assuming the YBOE EIP I cost estimate of $50–70 million dollars (or a median of $60 million) is correct, the State is already contributing to half of that cost by virtue of the $29 million in magnet aid provided during each of the fiscal years '95, '96, and '97 and thus should not be required to provide additional funding toward the cost of EIP I.

(7) The State contends that magnet aid not only supports the magnet programs integral to EIP I, but that the purpose of such magnet aid is as expressed in the New York State Division of the Budget's "Description of 1996–97 New York State School Aid Programs" (October 15, 1996) wherein it is noted that "magnet schools offer a special curriculum designed to attract students of different racial backgrounds. A total of $132.45 million ... will be provided to 19 school districts (including $115.23 million to the Big Five cities)." (City Exh. 5, p. 9).

*Opinion*

Perhaps it is important to first set aside a number of matters raised throughout the hearing which appear peripheral to the issue at hand. First among these is the contention by the State that EIP I is "done". Such a position, of course, defies the logic of the instant order calling for a determination on how the burden of EIP I costs should be distributed and would render such order moot. The Court, however, has not determined EIP I to be complete. More practically, of course, the case is such that portions of the remedy imposed in 1986 have yet to be fully implemented; there remains a continuing need to maintain and therefore fund what has been implemented; and finally there is the ongoing need to ensure that the Yonkers Public Schools can offer a quality and equitable education for all children who choose to enroll, and surely for the prevailing class in this case.

A second matter which, in a paradoxical way, is both outside and at the core of the issue at hand is whether the funding formula upon which a portion of State aid to education is derived is equitable. Aid to Yonkers does appear dramatically underfunded in relation to similarly sized districts (e.g., Syracuse receives 300% more formula aid than Yonkers). This issue, however, appears beyond the scope of the question before the Monitor; rather it is seen as a matter strictly for the State of New York and its constituents and one which should more appropriately be resolved, if need be, at the State judicial level. At the same time, this issue is clearly at hand because, while one might advise the Court to remain above the fray over issues of equitable State aid formulas, the *effects* of such issues fall squarely upon the instant dispute and pose a significant risk to holding hostage the effective implementation of the 1986 Order to Desegregate the Yonkers Public Schools. Thus, while fundamental issues of funding equity are beyond the reach of this Opinion, the effects of such issues cannot be ignored if they are seen to fall adversely upon the 1986 Order.

A third issue which emerged in various forms throughout the hearing is that of funding ability. This Opinion takes the position that ability to pay is not an issue—either way. While there is little question the City of Yonkers has come close to saturating its ability to cover the costs of EIP I and while it is true that the City's tax base has been eroding and while it is true the City has been witnessing a proportional shift in the allocation of resources away from City operations and to school operations, the incremental costs of currently unfunded EIP I demands estimated at $5 million in operating costs and $40 million in construction costs (independent of land), both subject to State reimbursement, are not so far beyond the City's financial reach as to threaten financial exigency. Similarly, claims of financial ability with respect to the State—to include recent public depictions of a State "awash" in a budget surplus attributable to an exuberant equity market—have no bearing upon this Opinion.

What will be addressed in this Opinion are the issues identified earlier as agreed to by the parties, notably an identification of EIP I provisions, costs, and funding patterns all leading to an opinion and recommendation as to how the future costs of EIP I should be distributed between the defendant parties. the City and State, and what role the YBOE also as a defendant party must assume to ensure the integrity of funding and, therefore, the effectiveness of the Order.

*What constitutes EIP I?* The matter of identifying programs, resources, services, and activities stemming directly from EIP I appears mostly clear, documented in YBOE Exhibit 3, and may be summarized to include magnet program teaching staff; a full day kindergarten program; a pre-K program, an extended day program; magnet program supervision, administration, and counseling; magnet program equipment and supplies; a public information program; staff development: a secondary school alternative education program; a research and evaluation program; transportation; and legal, compliance, and monitoring activities. In 1996–97, the YBOE reported approximately $44 million in direct costs for EIP I of which approximately $28 million was for instructional support and supervision and approximately $10 million in transportation. In addition, the YBOE claimed an overhead allocation of 10.9% (equivalent to the Federal standard) bringing total EIP I related operating costs to just under $50 million in 1996–97.

Beyond those provisions of EIP I currently implemented, YBOE Exhibit 3 documents approximately $5.5 million in programs and activities required by EIP I but not yet implemented to include the need for additional pre-K staffing and programming ($3.9 million); staff development ($.5 million); technology ($.6 million): and enrichment programming and staffing ($.2 million). In addition, the need exists for the equivalent of three new schools (cited earlier) to provide space for magnet programs, pre-K program expansion, and to elevate facility standards to generally accepted levels.

**Thus, the expressed provisions of the Court Ordered EIP I call for approximately $44 million in currently funded operating costs; $5.5 million in mandated, but unfunded operating costs; $5 million in allocated fixed costs; and $40 million in incremental facilities needs exclusive of land acquisition costs—and all prior to State reimbursement.**

*How is EIP I currently funded?* [2] At the threshold of developing a response to the question of how future EIP I costs should be distributed is the matter of how EIP I is

**2.** The question of how EIP I is currently funded becomes an issue only if one assumes that the future distribution of EIP I costs will not be borne solely by the City nor solely by the State. In fact, given the absence of any compelling reason to skew the distribution of burden toward either the City or State, it is assumed the City and State will share equally, 50–50, at least those costs of EIP I which flow directly from the 1986 Order and which are summarized above and cited in YBOE Exhibit 3. Thus, once the assumption is made that the City and State will share the burden, an issue arises as to whether some degree of sharing has already occurred, *de facto*, given State reimbursement to transportation and capital improvements and given State magnet program grants and further, whether the State should be relieved, therefore, of any burden beyond such reimbursements and grants assuming they are continued and constitute at least 50% of ordered funding requirements.

funded currently. At first, the identification of who bears the current financial burden of EIP I seems obvious: given that prior to October 1996 State liability was not found to exist, the burden for EIP I must clearly have fallen to the City of Yonkers. A few conditions, however, complicate such a quick determination and are worthy of citation:

a) The State does reimburse the City for a portion of EIP I related transportation costs—though such reimbursement has fallen from 90% in 1986 to about 40% today.

b) The State does reimburse the City for capital costs related to EIP I. Such reimbursement approximates 39% of State approved capital expenditures.

c) The State claims to support the costs of magnet programs—in recent years to the extent of $29.5 million annually.

d) And, if one is to accept the YBOE contention that EIP I costs are not readily mutually exclusive of much of the basic education costs in the District (a contention which the Monitor has supported in prior budgetary disputes between the City and YBOE), then the State formula aid appropriation to Yonkers of approximately $39 million must in some way be recognized as a foundational contribution to EIP I costs in the same sense that the City's allocation to education prior to 1986 has been viewed as a base budget, adjusted over time, upon which the 1986 Order was based.

**Among all the State contributions cited above, there appears to be little question that the State's reimbursement program for EIP I related transportation and capital improvements must be credited as an existing assumption of some EIP I related costs by the State.** Such reimbursements would not occur, but for the Order. Some, notably the NAACP (7–11 Tr., p. 156–157), have urged that the State and City should split equally that financial burden which remains once the State reimbursement is considered. Such urging cannot be endorsed; the State must be credited fully for its reimbursement toward its share of any imposed

EIP I burden. To fail to recognize such reimbursement as participation in the distribution of burden between the State and City would result in a disproportionate burden upon the State or, at best, be tantamount to suggesting (arithmetically) that if such reimbursement were more than half of the cost (as was once the case with transportation), the State and City combined would have to contribute more than 100% of the cost or the City would have to return a portion of the State reimbursement to assure, for example, a 50–50 distribution—none of which makes practical sense. The only fair position in this matter is to recognize instances of State reimbursement to the City for EIP I related transportation and capital costs as an assumption of EIP I burden by the State.

**The thorny issue, of course, is whether to recognize, as the State contends, that the State is contributing $29.5 million to the City to support EIP I related magnet program costs.** But first, one may wonder why there is such a need to labor and muse over the issue of whether the State is already contributing to EIP I costs? Is it not sufficient to begin anew, given a finding of State liability, and merely share the YBOE budget burden equally, as between the City and State, from this point forward? Surely, it is tempting to reason so. Fundamental to such reasoning is the observation that the more the question of fair distribution is tied to a prior determination of whether State aid or City budgetary allocations to Yonkers are EIP related, the more the Order will be subjected to the interests of the City or State rather than the Order, *per se,* and the children intended to benefit from the process. A fully funded EIP does not necessarily reduce to an effective EIP if the basic budget is not sufficiently founded to support EIP efforts. Thus, the process must begin with an acceptable *total* YBOE budget, including EIP costs, which the City and State must bear equally.

This Opinion, therefore, asserts with absolute confidence that the tangled tale of State aid, rendered suspect by a lack of confidence expressed openly by all levels of State, City, and YBOE leadership, cannot and therefore should not, provide a platform for determining the magnitude of State, and therefore,

City burden necessary for the *long-term* effectiveness of the Order. While State and City funding processes should be allowed to continue, unfettered, to serve City and State purposes, such purposes should not extend to imposing impediments, intended or unintended, upon the implementation of the Order.

But, there is a short-term and immediate obligation here. That obligation is to recognize that the City, State, and YBOE have been conditioned to think, and therefore argue, in terms shadowed and shaped by State aid policy. Given the degree to which such policy formed the basis for so much of the evidence and argument in this case, a decision to ignore its weight would constitute a less than full and faithful Opinion in response to the evidence, testimony, and arguments presented. In addition and importantly, despite Monitor concern about the *de facto* way in which City and State budgets shape the YBOE budget (and therefore the Order), the Court may differ and prefer to follow a logic which first identifies EIP I costs solely, and in a mutually exclusive fashion, and then seeks to credit the extent to which State aid supports such costs. Thus, the relationship of current magnet aid awards, as complicated as they are to decipher in terms of their intent, must be addressed.

What, then, is the applicability of current State magnet aid awards to the Order? A *surface* look at the issue of whether the $29.5 million categorical grant for magnet programs constitutes existing State support for EIP I seems to argue that it does so. Such position is further advanced by observations that:

a) The apparent (implied) stated purpose of the magnet program grants is to support programs which seek to attract students of different racial backgrounds (City Exh. 5, p. 9).

b) The YBOE receives the grant, ultimately, by responding to a State RFP (albeit after district specific funding has been appropriated) showing how such aid would be used. In fact, a recent YBOE response to the State's RFP (YBOE Exhibit 5) does reference, though with a notable absence of detail, magnet program related use of the State magnet program grant.

c) It is general knowledge that Yonkers officials, school administrators, and State representatives have petitioned the State continually for assistance with EIP I costs and an examination of City Exh. 10 shows that Yonkers is second (by $19 million) only to New York City (a system about 50 times the size of Yonkers) in the amount of magnet aid received and nearly three times the amount of magnet aid received by comparably sized Syracuse. In addition, the magnitude of increase in magnet aid to Yonkers since magnet aid grants began in 1983 has exceeded all other districts in the State, thereby suggesting that discretionary funding efforts at the State level have been responsive to Yonkers—though it is admittedly difficult to penetrate the "conscience" of the State to determine exactly why Yonkers' magnet aid increases have been the highest in the State. Cited below are magnet aid growth patterns among the "Big Five" cities since 1983:

**Table 1**

**CHANGES IN "BIG FIVE" MAGNET AID AWARDS, 1983–1997**

| District | 1983–84 Magnet Aid | 1996–97 Magnet Aid | Magnitude of Change 1983–97 |
|---|---|---|---|
| Buffalo | $2,250,000* | $17,025,000 | 7.5 times |
| New York City | 1,000,000 | 48,175,000 | 48 times |
| Rochester | 1,750,000 | 11,000,000 | 6.2 times |
| Syracuse | 750,000 | 11,000,000 | 14 times |
| Yonkers | 500,000 | 29,500,000 | 59 times |

\* It may be of some interest to note that Buffalo, beneficiary of the largest magnet aid award in 1983 when such aid program began, had been involved in desegregation litigation since 1976.

---

**But a closer analysis suggests that the State's allocation of $29.5 million for magnet program grants, while significant, is not expressly and wholly responsive to Court-ordered EIP I costs.** At the core of such assertion is substantial evidence to indicate that the actual purpose of the magnet grants is not clear and, at best, designed to serve a multiplicity of purposes. More specifically, evidence exists to indicate that the State's categorical aid to Yonkers in the form of magnet program grants may be intended to serve at least two purposes: magnet program support and an *ad hoc*, discretionary effort spawned by annual budget negotiations to compensate for generally accepted flaws in the State's basic funding formula for education.[3] From various testimony throughout the hearing, representing evidence from witnesses on all sides of the issue, it seems sufficiently clear that no strong foundation exists to account for a $29.5 million State magnet program grant as genuinely and wholly responsive to and intended for EIP I ordered programs. Consider the following:

- It is generally known that there is dissatisfaction with the State funding formula for education and such dissatisfaction has resulted in litigation over issues of equity.

- Testimony by a State witness indicated that State leadership has and continues to compensate for perceived flaws in the funding formula (7–17 Tr., p. 62 [Eatz] ).

- In 1993–94 the State revised the formula for educational aid as a response to concerns over equity, but has failed to implement it fully for lack of funds.

- State testimony indicated that it is fair to assume that magnet program grants do, in part, represent a mechanism for "fine tuning" educational aid (7–17 Tr., p. 63 [Eatz] ).

- While no clear evidence exists to show that the level of magnet program aid to Yonkers equates with a precise measure of perceived inequity (again, the magnet grant totals $29.5 million; the "transition cap" on reformulated aid prevented Yonkers from receiving nearly $20 million more in 1996–97 aid), it is curious to note that magnet program aid granted to Syracuse (the most comparable City district to Yonkers) is nearly $20 million less than magnet program aid granted to Yonkers thereby leavening the sense that magnet awards offer, again as State representation allowed, politically fueled mechanisms for achieving what the transition adjustment is intended to do but does not achieve: equalize basic aid to education. (City Exh. 10; 7–16 Tr., pp. 68–71 [Perfetti] and 7–17 Tr., p. 170–171 [Hamilton] ).

- In communicating magnet program aid to Yonkers, there is no evidence of a particular conveyance mechanism detailing the use of such aid and clearly no evidence was found to indicate the purpose of such aid is expressly directed to support Court-ordered programs.

- Magnet program aid is purely discretionary and subject to annual appropriations; as such, magnet aid may be expanded, reduced, or withdrawn, thereby reinforcing a sense that the State has not neces-

---

3. Is it not possible that magnet program aid can serve two functions simultaneously and fully: negotiated equity adjustments and magnet program contribution? It seems not, especially given the State's bifurcated aid system. Negotiated equity adjustments emanate from doubts surrounding the State's formula aid (non-categorical) for *State mandated* education. Any effort to address funding formula inequities via categorical grants (e.g., magnet aid) must be viewed, *de facto*, as an effort to leaven basic aid for *State mandated* programs and not for magnet programs which are recognized, but not mandated, by the State and therefore funded through categorical, rather than formula, aid. Said simply, the same dollar cannot claim to serve both formula and categorical aid.

sarily committed such financial support to a defined and sustained program effort (though it is a fact that actual grants have evidenced a sustained and increased pattern since 1983).

- State testimony indicated that funds provided through the magnet program category may go to school districts without magnet programs (though they may be planning such programs) or such grants may be used for innovation purposes or for the development of demonstration schools (7–17 Tr., pp. 65–67 [Eatz]).

- No evidence was found to indicate that the State engages in any collaborative design or design specification efforts or audit with respect to magnet program grants and little documentation in response to the State RFP for such aid is required of a school district, thereby reinforcing the sense that magnet aid may, in great part, be as State testimony allowed, general and compensatory assistance to adjust for formula deficiencies. Thus, one is prompted to question whether the classification of such aid as a magnet program grant is more a matter of political and administrative expediency than programmatic substance. In fact, testimony indicated that magnet program aid is often decided in the politically charged final days of formulating budget appropriations and is not awarded in response to school district application, but justified *ex post facto* (7–17 Tr., pp. 65–66 [Eatz]).

**Based, therefore, on the evidence and testimony presented, it seems reasonable to conclude that the recent level of magnet program aid provided by the State serves in part as an equity adjustment and, in part, as an effort by the State to respond to urgings from State representatives for Yonkers as well as City and YBOE officials to support desegregation costs in Yonkers.**

**How should the funding requirements for EIP I be distributed in the future?** The allocation of future costs of education in Yonkers, between the City and State, must be constructed in a way which allows for a short-term and long-term strategy; ease **of implementation; preservation of City, YBOE and State prerogatives over budgeting processes; timely expedition; economic sufficiency; and the offering of heightened hope that the conversation underlying the implementation of the Order may shift from one of political economics and public administration to a creative and determined focus on finding ways to elevate the academic and social skills and performance of Yonkers' children.**

There is no question, therefore, the following should guide the future funding of EIP I given the finding of State liability:

(1) A **short-term** (defined as applicable to fiscal year '97) financial distribution judgment should be imposed in a manner reflective of the evidence and arguments offered through the hearing before the Monitor and sufficient to implement EIP I for the 1997–98 year.

(2) A **long-term** (applicable to fiscal '98 and beyond) financial distribution judgment should be imposed which fosters the following outcomes and conditions:

(a) The sufficiency of the YBOE budget and its contribution to equitable and quality education for Yonkers' children should form the threshold for determining financial distribution. Sufficiency should not be limited to measuring only whether EIP I costs have been funded by the City and State but whether the remaining YBOE budget is adequate to ensure that a fully funded EIP can succeed. Thus, burdensome, mechanical arguments over what constitutes "EIP related" and "non-EIP related" funding (imagine the complications which are bound to occur assuming progressions to EIP I, II, III, ... ) should be avoided by creating a reasonable and sufficient *base* of funding for the YBOE, supportive of the Order, upon which future budgets may be built.

(b) Equal funding obligations for education should be inherited by the City and State.

(c) Maintenance of State and City budgetary efforts should be assured in a manner appropriate to YBOE needs.

(d) Obfuscating arguments over the fairness of the State's formula-based aid should be avoided when determining burden distribution and the administration of such formula should, within the law, remain the prerogative of the State.

(e) The State's categorical aid decision making process should remain essentially unimpeded, with intervention manifested only by a judgment upon the State when the effects of such process are found to be adverse to the Order.

(f) Economic sufficiency to support the Order over the long-term should be assured, especially with respect to the City's facility to participate in any longer-term, more programmatic amendments to the Order (focused squarely on leavening student learning and academic achievement) which may be imposed (e.g., that which is currently before the Court and commonly known as "EIP II").[4]

(g) State funding for education should be allowed to flow to the YBOE, in a manner respectful of the City's governance process, but with the reduced risk that the Yonkers Public Schools and the Order will be held hostage, however temporary, by annual funding arguments.

(h) The need for Court intervention, especially at the operational level of school management, should be minimized.

**How should funding requirements be distributed in the short term?** As indicated earlier, the issue of immediate funding distribution is complicated not so much by a deter-mination of what is needed to go forward with the Order, but rather how to measure the extent to which State contributions to education in Yonkers, occasioned by State law, regulations, or discretionary appropriations, should be credited to the State as a contribution to the costs of EIP I. **At least four options are offered to address this immediate issue:**

*Option (1)*

No credit toward EIP I costs would be recognized in the case of transportation and capital expenditure (building) reimbursements from the State and no credit should be given to the State for discretionary, categorical aid to support magnet programs. Such an assumption would result in a judgment upon the State to provide half of the estimated $50 million in current EIP I operating costs and half of the EIP I capital costs estimated (from City Exh. 3) currently at $1 million.[5]

*Option (2)*

Credit would be given for transportation and capital reimbursements, but not for aid to magnet programs on the assumption that the latter is really an offset to perceived inequities in State funding for education. In this case, the State would be credited for approximately $3.5 million (40% × $9 million) in transportation reimbursement and $1 million in capital reimbursement (see City Exh. 3) resulting in an incremental EIP I judgment of approximately $21.5 million. Future costs (e.g., $5 million in unfunded operating costs and the debt service on $40 million of required new facilities cited earlier) would be shared equally between the City and State to include the recognition of State reimbursement for any transportation or facilities costs.

*Option (3)*

Thirdly, an option might be that the State would receive full credit for its transportation

---

4. A secondary and positive, though unintended, effect of such "sufficiency" may be the City's economic facility (as distinct from ability) to address the Housing Order in a complementary, rather than competitive, manner *vis a vis* the School Order.

5. State reimbursement for capital costs is provided as an annual offset to debt service and not as a lump sum payment against the principal cost of a facility. Given Option (1), then, the State would be required to contribute approximately $26 million beyond the $83 million level of 1996–97 aid. In addition, future operating and capital costs would be borne equally.

and capital reimbursements as well as full credit for magnet aid. On this basis, no further financial judgment would be imposed on the State unless operating costs are determined to exceed twice the State's current contribution to EIP I (as assumed under Option (3)) of approximately $35 million in reimbursements and magnet aid.

### Option (4)

A fourth option might be to recognize the State's EIP I transportation and capital reimbursements as full credits, but that portion of magnet aid measured more as *de facto* offsets to State acknowledged concerns over funding inequities and less as substantive contributions to magnet programs would not be credited. **But, how might such measure of inequity be guided and achieved?** The most objective measure, and the one most disarming to State objection, is the State's own measure of equity compensation: the transition adjustment. Given such adjustment for Yonkers is approximately $30 million, of which approximately $10 million was funded (the exact amount for 1996–97 is $10,617,365), it is reasonable to assume that the *unfunded* equity adjustment to which a portion of the State's $29.5 million magnet aid award was directed amounts to approximately $20 million (the exact amount for 1996–97 is $19,726,066; see City Exh. 3), thereby resulting in the recognition of a State contribution to EIP I magnet programs of $9.5 million.[6]

Options (1) and (2) cannot be accepted given the prior analysis addressing reimbursements and the apparent purposes of categorical, magnet aid. The State has contributed to EIP I costs, including magnet program costs. Option (3) cannot be accepted for the same reason as in the case of Options (1) and (2) *and* because there is serious concern that Option (3) would not be sufficient to assure the effective implementation of the Order. Furthermore, Option (3) would serve only to re-ignite the debate over whether the City has sufficient resources to go forward with EIP I absent new investment from the State; the consequence of such debate would certainly and unduly stall the effective implementation of the Order.

**How should the short-term funding of EIP I be distributed?** Option (4) offers not only the best course reflective of the testimony and evidence presented in this hearing, but it offers an **appropriate** level of incremental funding **sufficient** to insure the **effective implementation** of the 1986 Order as it is currently configured for 1997–98.[7]

### Recommendations

It is recommended that the Court direct the parties to collaborate, with the assistance of the Monitor, on the drafting of an Order for consideration by the Court (it is respectfully suggested that Counsel for the NAACP and YBOE initiate such draft in consultation with the Monitor). Such draft should incorporate at least the following recommendations:

### Recommendation 1 (Short-term remedy and judgment)

■ It is recommended that the State's EIP I financial burden be retroactive to the date of the October 1996 finding of liability

6. It may be that, given changes in State funding mechanisms, the "transition adjustment", as a measure of inequity will change not only in terms of its dollar value, but the mechanism for measurement conceivably may be abandoned. Such circumstance should not upset this analysis which is intended only to establish a base level for imposing an immediate, fiscal '97 based judgment upon the State (yet another reason for limiting a reliance on arguments wedded to the deciphering of State aid processes to a short-term, not longer-term, financial distribution template).

7. The City may view this position as inherently unfair because it has had to bear much of the cost of EIP I since 1986; because it believes State aid formulas are especially unfair to Yonkers; and, therefore, because it perhaps hoped for compensatory relief. But the task here is not one of remedying alleged inequities in alleged inequities in formula aid, nor is it to compensate the City for shouldering much of the burden prior to a finding of State liability. The task before the Monitor is to assess a defensible burden upon the State, based on credible testimony and evidence *sufficient* to insure the effective implementation of the 1986 Order. Issues of compensatory justice for a Yonkers claim that the State should reimburse Yonkers for alleged disproportionate burdens it bore prior to October 1996 and/or for funding inequities are left to the Federal and State judiciary, respectively.

and a judgment should be imposed upon the State of New York to reimburse the City of Yonkers for that *pro rata* portion of the 1996–97 EIP I costs as guided by the formula cited below:

$$ST = (F + C) + .5(EIPIO + EIPICE) - (RT + RCE + RMG)$$

Where:

| | | |
|---|---|---|
| ST | = | State financial burden for 1996–97 |
| F | = | State formula aid award for education to Yonkers |
| C | = | State categorical aid for education to Yonkers |
| EIPIO | = | EIP I annual operating costs, direct and allocated indirect |
| EIPICE | = | EIP I capital costs (essentially debt service) |
| RT | = | State reimbursement for related transportation costs |
| RCE | = | State reimbursement for capital expenditures (facilities) |
| RMG | = | State reimbursement for EIP I related magnet programs as recognized by the Court in 1996–97. For purposes of the Opinion, RMG is assumed to be equal to total magnet aid ($29.5 million) minus the unfunded transition adjustment ($20 million) or $9.5 million. |

Therefore, it is recommended that the judgment upon the State for 1996–97 and applicable as aid toward 1997–98 be guided as follows:

| | | |
|---|---|---|
| ST | = | $(F + C) + .5(EIPO + EIPCE) - (RT + RCE + RMG)$ |
| ST | = | $(39 + 44) + .5(50 + 2) - (3.5 + 1 + 9.5)$ |
| ST | = | $83 + 26 - 14$ |
| ST | = | $83 + 12 = \$95$ million (annual); $92 million, *pro rata* @ .75 year |

As such, a judgment upon the State of $9 million ($92 minus $83) is recommended as applicable to the Order for 1996–97.

### Recommendation 2 *(long-term remedy)*

For the longer term (fiscal '98 and beyond), it is recommended that an Order be effected so as to create an evenly distributed burden, between the City and State, and a *base budget* for education in Yonkers which serves the long-term objectives cited earlier in this Opinion. The essence of such distribution is presented below to include the short-term, 1996–97 proposed distribution cited in Recommendation (1), above:

Table II

PROPOSED SHORT AND LONG TERM CITY AND STATE DISTRIBUTION OF FINANCIAL BURDEN IN SUPPORT OF THE YONKERS PUBLIC SCHOOLS.

| | CITY | | | STATE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | CB | ORD | City Total | ORD | T | CE | MG | C | F | State Total | City/State Total |
| '97 Actual | 101 | 38 | 139 | 0 | 3.5 | 1 | 29.5 | 10 | 39 | 83 | 222 |
| '97 Proposed | 101 | 26 | 127 | 12 | 3.5 | 1 | 29.5 | 10 | 39 | 95 | 222 |
| '98 Proposed | 85 | 26 | 111 | 28 | 3.5 | 1 | 29.5 | 10 | 39 | 111 | 222 |

Where:
 CB= City base burden
 ORD= Ordered impact
 T= Transportation Reimbursement
 CE= Capital Expenditures (facilities) reimbursement
 MG= Magnet Aid awarded by State
 C= Other Categorical aid
 F= Formula Aid

Notes:

(a) All entries are shown in constant (1996–97) dollars, in millions.

(b) The recommended judgment upon the State for 1996–97 is $12 million adjusted, *pro rata*, to $9 million (subject to final confirmation of 1996–97 budget data).

(c) The forecasted judgment upon the State for 1997–98 (applicable to 1998–99) and beyond is $28 million measured in 1996–97 terms; final annual judgments for 1997–98 and beyond will vary with changes in formula aid, categorical aid, and approved YBOE budget levels.

(d) The City and State total of $222 million compares with a YBOE budget of $232 million with the difference attributable to other funding sources which the City, YBOE, and State are urged to continue cultivating.

(e) For purposes of shaping the 1997–98 YBOE budget, the State's distribution is limited to a total of formula aid and categorical aid at levels equal to or greater than that awarded in 1996–97 plus $9 million. The City's financial distribution for 1997–98 should be equal to the YBOE budget (yet to be approved) minus 1997–98 State aid to include the $9 million proposed judgment.

(f) The YBOE budget for 1998–99 and beyond should assume the following process:

1. The YBOE, City, and State should follow their normal budget processes.

2. The YBOE and City should agree, in a timely fashion, on a YBOE budget for the next fiscal year; the State may participate in the final review of that process, as may all parties of interest.

3. The City should commit to 50% of the approved YBOE budget (exclusive of that portion of the YBOE budget funded from sources other than the State).

4. The State should decide its formula and categorical aid to Yonkers on a good faith basis and in accordance with State law and policy.

5. As a rule, the difference between the 50% of the YBOE budget assumed by the City and total State education aid to Yonkers should constitute the judgment upon the State for a given year. In the event total State education aid to Yonkers exceeds 50% of the YBOE budget for a given year, the State should be seen as meeting its obligation under the Order and the City should inherit responsibility for the balance of YBOE funding.

***Recommendation 3*** The YBOE should submit, by November 1, 1997, a plan of action detailing its strategy for implementing remaining EIP I ordered programs currently unfunded and unimplemented.

### Recommendation 4

The YBOE should be required to submit a plan of action by December 1, 1997 detailing its strategy for providing the equivalent of 39 new classrooms to address space deficiencies and magnet program needs as well as sufficient capacity, however distributed, to accommodate the approximately 700 children eligible for pre-K instruction but unable to be served for lack of space.

### Recommendation 5

The YBOE should submit, by January 15, 1998, a detailed and updated review and status report on magnet programs to include information and assessments on the adequacy of facilities, equipment, staff, program design, and student/family/community interest.

### Recommendation 6

The YBOE should provide the Court, by January 15 of each year, with a report on the District's sources and uses of funds for the past five years accompanied by explanations regarding major changes in the allocation of such funds. A template for such report was first designed by the parties in 1994.

### Recommendation 7

The issue as to whether the basic funding formula for education is equitable to the City and YBOE should remain a matter for the City, YBOE, State and, if necessary, the State judiciary, except to the extent that the consequences of such issue distill adversely upon the effective and sufficient implementation of the 1986 Order as amended.

### Conclusion

This Advisory Opinion represents the Monitor's opinion, findings, and recommendations emanating from the testimony, evidence, and arguments presented in formal hearings conducted on July 14, 16, and 17, 1997. The recommendations in this Opinion offer a proposed distribution of financial burden between the City and State for the short-term (1996–97) and the longer-term (1997–98 and beyond). For the short-term, this Opinion recommends that the distribution of financial burden for 1996–97 include a *pro rata* judgment (retroactive to the October 1996 finding of State liability) of $9 million imposed upon the State and credited to the City as applicable to its 1997–98 operating budget.

This Opinion asserts that if the issue of financial burden distribution is confined only to EIP I costs and does not recognize that the effectiveness of the Order is determined by an EIP I judgment cast in the midst of a total, necessary and sufficient YBOE budget, the longer-term effectiveness of the Order will not be served and the current dispute between the City and State will be re-cast for years to come. Thus, this Opinion recommends further that the determination of State and City financial burden for the long-

er-term (1997–98 and beyond) begin with the assumption that the State and City should bear equal funding responsibility for a total YBOE budget deemed necessary and sufficient to support the Order and that the State be given full credit, toward its one-half share of such YBOE budget, for any and all formula and categorical aid it may award to Yonkers education for 1998–99 and beyond. Thus, the judgment upon the State for 1997–98, applicable to operating costs for 1998–99, is recommended and predicted to be $28 million calculated in 1996–97 budgetary terms adjusted for future changes in the YBOE budget and/or future changes in the level of State aid to education awarded to Yonkers.

**Parties may file a response to this Opinion with the Clerk of the Court not later than 4:00 P.M., Thursday, September 4, 1997.**

### ORDER FOR FURTHER DESEGREGATION RELIEF IN THE YONKERS PUBLIC SCHOOLS

The factual findings and legal conclusions that serve as the basis for this Order have been set forth more fully in prior decisions of this Court and of the Court of Appeals in this action, including those contained in the Opinion filed together with this Order, and familiarity with those decisions is assumed.

In sum, this Court found in 1985, *inter alia,* that the Yonkers Public Schools ("YPS") was a racially dual school system, characterized both by segregation among schools and inequalities in the educational opportunities provided for students of differing racial and ethnic backgrounds. *See* 624 F.Supp. 1276. In May 1986, the Court ordered implementation of a desegregation remedy referred to as Educational Improvement Plan ("EIP" or "EIP I"), by which the Yonkers Board of Education ("YBE" or "Yonkers Board") put in place a magnet school program with certain related provisions that effectively eliminated segregation in enrollments among public schools in Yonkers. *See* 635 F.Supp. 1538, *aff'd,* 837 F.2d 1181 (2d Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988).

In 1993, based on an application by both Yonkers Board and the plaintiff-intervenors, this Court found that vestiges of the dual school system continued to exist in YPS. The effect of those vestiges, the Court found, was that "although minority students in Yonkers attend school in the same buildings as majority students, they are undergoing different educational experiences" which adversely affect their learning and performance in school. *See* 833 F.Supp. 214, 225.

In 1995, this Court made factual findings regarding the role of the State of New York and other State defendants ("the State"[1]) in connection with the creation and maintenance of the dual school system in YPS. *See* 880 F.Supp. 212. In 1996, the Court of Appeals, based on this Court's findings, held that the State was liable, under 42 U.S.C. § 1983 and the Equal Educational Opportunity Act, 20 U.S.C. §§ 1701, *et seq.*, for the unlawful dual school system in YPS, because the State, *inter alia*, had taken "actions that encouraged the perpetuation of segregation" in YPS. 96 F.3d at 618–19.

During a trial commencing on September 15, 1997, the State was given an opportunity to present evidence which it argued would show that vestiges of segregation no longer exist in YPS. This Court has found that the evidence before the Court establishes that the conditions which this Court identified in 1993 as vestiges of the prior dual school system continue to exist in YPS. The Court further has reaffirmed and specifically found that continuing vestiges of segregation in YPS are traceable to the prior dual school system that was established and maintained in substantial part by conduct of the State. Accordingly, the Court has now found that the State is liable for eliminating segregation and its vestiges in YPS and therefore must fund a remedy (as specified in this Order) to accomplish that goal.

During the remainder of the September 1997 trial, the Yonkers Board presented its proposed remedial plan—referred to as Education Improvement Plan II ("EIP II")—for eliminating to the extent practicable the vestiges of segregation that continue to exist in YPS. In general, the Yonkers Branch of the NAACP, *et al.*, supported the YBE in its presentation of EIP II to the Court. The stated goal of EIP II, as well as the goal of this Order, is to eliminate the vestiges of segregation that this Court has found exist in YPS.

The State did not present the Court with any alternative to EIP II for remedying the vestiges of segregation in YPS, and it presented no persuasive evidence that any element of EIP II was inappropriate either educationally or as a remedial measure. Indeed, on balance, the testimony of the State witnesses supported the appropriateness of EIP II both for improving educational performance, particularly among minority students in YPS, and for eliminating inequities in the educational process and in student performance.

■ In the Findings of Fact that accompany this Order, the Court has found that the EIP II plan proposed by the YBE provides the framework for an appropriate remedial plan tailored to the task of eliminating the vestiges of segregation in YPS schools to the extent practicable. Accordingly, it is hereby ORDERED that EIP II be implemented pursuant to the substantive provisions and the implementation schedule set forth below.

## I. ESTABLISHMENT OF STANDARDS AND CURRICULUM

(a) A proper foundation for a plan to remedy the vestiges found by this Court is the development of a unitary set of standards for what all students regardless of race or eth-

---

1. For the purposes of this Order, unless the context indicates otherwise, the term "State" encompasses the following defendants: The State of New York; The Board of Regents of the State of New York; Carl T. Hayden; Louise P. Matteoni; Jorge L. Batista; Edward J. Meyer; R. Carlos Carballada; Adelaide L. Sanford; Diane O'Neill McGivern; Saul B. Cohen; James C. Dawson; Robert M. Bennet; Robert M. Johnson; Peter M. Preyor; Anthony S. Bottar; Merryl H. Tisch; Harold O. Levy; and Ena L. Farley, in their official capacities as members of the State Board of Regents; Department of Education of the State of New York; and Richard P. Mills, as Commissioner of Education of the State of New York.

nicity in YPS at each grade level should be taught and expected to learn. The YBE has presented the Court with a plan for developing and disseminating throughout YPS standards of this type, which are consistent, attainable and clearly defined. Moreover, the use of such a standards-based approach to promoting educational equity has been endorsed and widely promoted by the State.

(b) In addition to establishing such standards, the defendants must assure that all students are given an equal opportunity to meet those standards by providing the educational resources and supports necessary to address the educational needs of all students and otherwise to eliminate the conditions previously identified as vestiges of the dual school system in Yonkers. Among the most important of these resources are teachers who are trained and provided necessary support to implement these standards through effective instruction and assessment designed to meet the needs of all students. Teachers shall be provided with a curriculum, assessment tools and teaching strategies, which are aligned with these standards. The following steps will be taken to achieve these goals:

- The Yonkers Board will establish uniform standards for each grade level based on the nationally-developed New Standards and existing New York State Standards.

- District staff shall develop a curriculum based on the standards which include benchmarks for measuring student achievement in relation to the standards, suggested methods of assessment and sample instructional techniques for implementing the curriculum successfully in a racially and ethnically diverse school system.

- All staff members shall receive staff development training in the standards and assessment techniques, appropriate teaching strategies and content renewal in order to ensure that all staff are well-prepared and required to meet the academic needs of all students, regardless of race.

- At the school level, professional staff shall adapt the curriculum to each school's magnet or other individual school program or focus in order to ensure the continued desegregation of student enrollments by voluntary choice under EIP I.

- The standards shall be shared with parents, students and the community;

- The progress of students in meeting the standards shall be monitored with a goal of ensuring equal educational opportunities and promoting equity in educational performance for all students in YPS.

## II. STAFF SUPPORTS

In order to provide equality of opportunity for student learning and performance based on the above standards, teachers trained to demonstrate the same high expectations for minority and non-minority students and prepared with the skills and resources to help all children reach those expectations are necessary. Accordingly, the actions described below shall be taken in the areas of hiring and mentoring new teachers, staff development, and staff supervision and evaluation to prepare teachers to provide appropriate instruction for all students regardless of race or ethnicity. A basic skills program and information rich classrooms also shall be provided to ensure that teachers have the supports necessary to implement appropriate instructional practices to meet the needs of all students in YPS and, in particular, the needs of minority students which historically have not been adequately addressed.

### A. Hiring and Mentoring New Teachers

To ensure that teachers new to YPS will contribute to promoting equality of opportunities for all students, and will not accept or perpetuate vestiges of segregation in YPS, the Yonkers Board and District staff shall undertake the following:

- Targeted early recruitment efforts to identify qualified teachers, including qualified minority teachers, with in-service or pre-service training or expertise

in working with minority and LEP students.

- Efforts to facilitate the hiring of teachers capable of addressing the needs of minority students in heterogeneous, multicultural classrooms by working with teacher training institutions in identifying appropriate preservice course content and by providing training opportunities within the District through professional development schools and internships.

- Development and implementation of a mentorship program for new teachers designed to promote the understanding and active participation of those teachers in meeting the goals of this remedy and to deter perpetuation of inappropriate attitudes and practices traceable to the prior dual system.

- Ongoing staff development for new teachers during their first three years of employment in YPS, including human relations training and training in instructional techniques necessary for teaching diverse populations.

## B. Professional Development

(1) In order to ensure that all staff members, including the many veteran teachers who have worked in YPS since prior to implementation of the EIP I remedy, are prepared to implement standards and to provide instruction that equitably meets all students' needs, regardless of race or ethnicity, professional development training will be provided to all staff members on a district level and a school-based level. Because of the systemic nature of the problems being addressed, all staff will be required to attend professional development activities appropriate for their position under this Order. Professional development activities under this Order shall be provided in a manner and at sufficient times and places so that mandatory participation in those activities can be accomplished.

(2) Professional development shall be provided at the District and school levels through summer institutes, staff development sessions during the school year, and in professional development classrooms. Professional development shall include the following activities, many of which are further discussed elsewhere in this Order:

- District-level staff development for Teaching and Learning, including effective alignment of curriculum and assessments to standards, creating and using alternative assessment to inform instruction, instructional techniques for facilitating student learning based on high standards;

- School-based professional development for Teaching and Learning including child development, inquiry-based teaching, multicultural curriculum, language acquisition for second language learners, teaching strategies for special needs students, connection of home, school and community experiences in a multicultural context;

- Development activities to support curriculum implementation based on high standards for all students, which includes training in teaching strategies and curriculum content;

- District-level and school-based Human Relations Training designed to raise teacher expectations for minority students (e.g., TESA and Efficacy) and diversity training designed to promote understanding of individual student needs and improve interpersonal relations among diverse groups, including training related to student rights and responsibilities, conflict resolution, and behavior management to ensure equitable treatment of minorities in the disciplinary process and positive school climate;

- Administrative staff development for effective hiring, supervision and evaluation;

- Staff Development for Pupil Personnel in areas such as student diversity, student rights and responsibilities, the use of pupil support teams, standards and their implications for counseling, the assessment of student capabilities, and modes of learning;

- Expansion of conflict resolution and peer mediation programs to all schools and provide student leadership training; and

• Technology Support, including instruction on the use of technology in the classroom as an instructional and assessment tool:

Consistent with the parameters established by this Order, program funding for staff development may vary depending on each school's individual needs, but the following staffing resources shall be provided:

• Staff resource libraries at each school;

• During the initial implementation of EIP II, staff development assistance at each implementing elementary school that is equivalent to a curriculum staff developer, a human relations developer and a technology staff developer, (each of whom shall be assigned on a half-time basis), and staff development assistance at each secondary school that is equivalent to a three-person team concentrating on the same three areas; after the initial three year implementation is completed, staff development assistance equivalent to one staff member at each school; and

• A pool of substitute teachers to be made available to those schools undergoing initial implementation of EIP II to provide consistent and effective coverage of classes so that teachers may attend professional development activities, including school visitations, as necessary during school hours.

## C. Staff Supervision and Evaluation

The success of this Order in remedying the vestiges of segregation in YPS will depend in significant part on the effective supervision and evaluation of staff to ensure that they provide instruction and otherwise conduct themselves in school in a manner consistent with the staff development and other provisions of EIP II. In order to equip administrators to achieve these objectives, they shall be provided with professional development in supervision and evaluation with a specific focus on conditions this Court has identified as vestiges. A supervision and evaluation model to allow administrators to support staff in implementing EIP II also shall be

developed. Evaluation parameters to support professional practices in line with EIP II shall be established. The Yonkers Board shall establish evaluation procedures that will ensure effective implementation of the provisions and goals of EIP II.

## D. Basic Skills Program

Basic skills programs in reading, writing and math shall be implemented at each school as a tool for ensuring that all students, regardless of race or ethnicity, receive instruction appropriate to their needs and to provide them with an equal opportunity to meet the academic standards to be established in these core areas. Such programs also shall be designed to address existing achievement and performance gaps among minority and non-minority students, which this Court has found are consequences of segregation and its vestiges in YPS. Basic skills programs shall be established on both the elementary and secondary levels. These programs shall ensure that teachers are able to use instructional strategies and assessment techniques that allow for different learning styles and needs rather than focusing principally on the needs of majority students.

1. *Elementary Basic Skills Program:* The following supports shall be provided in order to implement a strong basic skills program at the elementary level:

• Professional development in knowledge and skill development in basic literacy based on a balanced reading program for all principals, assistant principals, classroom teachers, reading teachers and ESOL teachers;

• Pursuant to the above provisions on staff development, school-based staff developers or consultants to provide training and coaching in early literacy and mathematics to classroom teachers;

• Necessary materials to implement a basic skills program, such as appropriate books, computer software, database access and a computer lab in each school;

• Reading Recovery or another research-based reading program, at each elementary school for students in need of specif-

ic reading supports at early grade levels; and.

- Other targeted student supports, including tutorials as appropriate, for students not meeting expected standards and students entering grade levels at which State-mandated assessments are administered.

2. *Secondary Basic Skills Program:* The following supports shall be provided in order to implement a basic skills program on the secondary level:

- Elimination of general or low track high school courses;

- Implementation of the Equity 2000 program or a program that accomplishes similar objectives of encouraging successful completion by all students, regardless of race or ethnicity, of rigorous academic courses and provision of other necessary student supports to allow all secondary level students to complete Sequential Math I and II by the end of the tenth grade;

- Reinstatement of the Johns Hopkins Summer Skills Reinforcement Program or a program that accomplishes similar objectives;

- Information and services on career and college preparation in order to enhance student motivation; and

- Other targeted student supports, including as appropriate, tutorials for students not meeting expected standards and students who have yet to successfully complete state-mandated assessments.

### E. Information Rich Classrooms

(1) Information rich classrooms, as discussed in EIP II, are required for the District to meet the educational needs of all its students in desegregated classrooms. The District shall have available and provide equitable access to materials that are necessary and appropriate to support effective instruction and learning for all students in YPS, including, textbooks, library materials, computers, laboratory facilities and equipment and other instructional materials for inquiry such as manipulatives and audio-visual materials.

(2) To the extent a school does not already have such materials, each elementary school shall be provided with the following resources in a manner consistent with the needs of its student population:

- Appropriate fiction and nonfiction books, books on tape, creative writing materials, science materials, math manipulatives with problem solving activities, calculators and computers with a variety of interactive software;

- Instructional materials that have a non-biased, multi-cultural focus;

- Networked computers in classrooms for instructional use;

- Dedicated space and appropriate resources to enable the teacher to demonstrate material to a small group or whole class, using authentic materials through multi-media approach; and

- Books and materials in English, Spanish and other appropriate languages in classrooms and school libraries.

Secondary schools shall be provided with the following resources in a manner consistent with their individual needs:

- Appropriate books, primary source materials, audio-visual materials, computers and multi-media software, materials in the areas of reading, mathematics, writing, critical thinking, social studies, science and language;

- Technology support at the classroom level and direct access for teachers on a variety of networks, including four networked computers and a teacher demonstration center in each core classroom; and

- Five technology sites to be established by the Yonkers Board throughout the District to provide students with equitable access to computer technology outside the school day.

(3) Teachers also shall be provided professional development support in the use of materials and technology in activity-based, student-centered learning that will allow them to better meet the needs of minority students.

## III. STUDENT SUPPORTS

In order to overcome continuing vestiges and unequal educational opportunities, and to provide students with the supports necessary to offer equal opportunities for successful learning, the following steps shall be taken:

### A. Expanded Prekindergarten

Full-day prekindergarten shall be made available to all preschool students in the District whose parents wish them to attend, in order to assist all students to enter school ready to learn, to reinforce uniform teacher expectations for all students, regardless of race or ethnicity, and to decrease unnecessary or inappropriate referrals to special education. Expansion of the pre-kindergarten program under this Order shall promote the dual goals of providing service to those children most in need of early childhood educational opportunities and of maintaining racial/ethnic desegregation of enrollment in the program.

### B. Personalization of Schools

Greater personalization of schools and instruction shall be provided in YPS to meet the needs of diverse groups of students and reinforce appropriate teacher attitudes and practices. The following specific steps towards greater personalization shall be taken:

1. *Student/Teacher Ratios:* Personalization of instruction shall be provided in part through lower student to teacher ratios. To the extent permitted by facilities and other constraints, staffing levels will be increased to a level to allow for one teacher and a trained teaching assistant for every 18 students in primary grade classes (pre-kindergarten through grade 1); one teacher for every 22 students in grade 2 and 3 classes; one teacher for every 25 student in grades 4–6 classes; and one teacher for every 25 students in academic classroom settings and a total "teacher load" of 100 students during the school day for grades 7 through 12. Changes in class size shall be phased in so that, to the extent practical, children already enrolled in a school will not be displaced.

The Yonkers Board shall develop a plan for identification of facilities or space, and make a determination of the need to hire additional teachers and staff to facilitate the above reductions in student to teacher ratios. Development of this plan shall be a part of the submission called for pursuant to ¶ VI(2) of this Order. Professional development training shall be provided to teachers specifically to assist them in developing and utilizing instructional strategies designed to promote individualized instruction and equal opportunity for students in the context of reduced class sizes or teacher loads.

2. *Alternative Organizational, Scheduling and Multi-year Assignment Options:* At the elementary school level, options will be developed and implemented to permit teachers to teach students over a period of two or more years. Professional development opportunities shall be provided to staff regarding organizational options, restructuring of scheduling and multi-year classes or teacher assignments as options for enhanced personalization. For schools that choose or are required to change their organizational structure, schedule or assignment process, staff development and other planning resources shall be provided regarding implementation of these changes to all administrators and teachers and other professional staff. Additional resources needed to fully implement these changes shall be provided to the school or class.

3. *Advisor/Advocates:* The District will design and implement a program that will provide each student with a professional staff advisor/advocate to ensure that no student becomes a victim of bias or neglect and that all students have the opportunity to succeed. No staff member shall be assigned more than approximately 12 students. Pupil personnel staff members shall be assigned to assist each teacher with his or her group of students.

4. *Enhanced Pupil Personnel Services:* Pupil personnel services shall be enhanced in order to assist staff in fully understanding and equitably meeting the learning needs of individual students from all backgrounds. The following steps shall be taken to achieve this goal:

- Each elementary school shall have access to a Pupil Service Team consisting of a

school psychologist, social worker, nurse and counselor. Multiple teams shall be provided at the secondary school level based on the number of students in each school, such that the number of teams and staff of each type are sufficient to meet the needs of students in the school. The Pupil Service Team will work with teachers to meet the needs of students and to support greater equity in the provision of educational services and in student performance, consistent with the goals of EIP II.

- Student Assistance Counseling Services shall be expanded at all junior high schools and high schools.
- Schools shall strive to engage community based organizations and/or social agencies to provide services in the school during the school day and after school.
- The existing Alternative Program shall be expanded to include a program at the Junior High School or Middle School level.

### C. Supports for Limited English Proficient Students

Approximately 40 percent of students currently enrolled in YPS are Hispanic, a disproportionate number of whom are identified in accordance with State regulations as having limited English proficiency ("LEP"). As part of the segregated and unequal system of schools that historically existed in Yonkers, YPS has never had programs adequate to address the educational needs of Hispanic and, in particular, LEP students. In order to meet the needs and support equitable performance in school of LEP students, the following supports shall be provided:

- Diagnostic assessment of students new to the District, as needed, to determine level of current language and academic proficiency;
- A newcomer program to ensure appropriate services are provided for students new to this country;
- A double period of English as second language instruction for all beginning English speakers who would benefit from such service;

- Sheltered content instruction without native language support for students who have achieved at least an advanced level of English comprehension;
- Appropriate materials in the native language of all LEP students;
- Staffing levels that allow for one ESOL teacher for approximately every 50 ESOL students;
- Additional developers in Bilingual and English as a Second Language Instruction to provide staff development to teachers throughout the District in instructional methodologies for teaching LEP students;

### D. Extended Learning Time

Schools will provide students with opportunities for extended day, extended week, and/or extended year instructional time if they need additional instruction at the elementary level in basic skills or at the secondary level if they need additional instruction in order to keep pace with the standards and courses called for by this Order. Based on experience gained in implementing this Order, the Yonkers Board shall identify and provide appropriate extended learning time opportunities to augment or complement the other provisions of this remedy.

## IV. FAMILY SUPPORTS

### A. Parent/School Communications

In order to overcome barriers to greater parental involvement created by EIP I, particularly for minority parents and parents whose children attend magnet schools away from the communities in which they reside, the following steps shall be taken to facilitate communication between parents and schools:

1. *Parent Survey:* The District shall design, disseminate and analyze a survey seeking input from parents and the community regarding methods for improvement of Yonkers schools.

2. *Family Centers:* Family Centers similar to those already in existence in some schools in Yonkers shall be established as needed in other schools. The Family Centers shall have parent aides trained to work

with families by providing training in areas such as family literacy.

3. *Parent Training in Learning and Development:* Parents shall be provided opportunities as appropriate to be trained to assist in their child's learning process through home-based or family center-based programs. Parents of pre-school students shall be provided opportunities for training in early learning activities and techniques through programs like Even Start. In addition, the HIPPY program will be expanded to all schools with pre-kindergarten programs. Parents of students in the first through eighth grades shall be provided opportunities to participate in programs designed to involve parents in student learning in math such as Family Math and TIPS.

4. *Homework Hotline:* A homework hotline shall be provided in each school to allow parents to call for daily messages from their child's teacher regarding homework and other important information.

## V. DISTRICT SUPPORTS

The District shall be provided the necessary supports to implement fully, sustain, evaluate and monitor EIP II. Additional staff or resources shall be made available at the Central Office level:

- Expansion of the District's current student data collection and analysis capabilities;

- Additional technology experts and a network engineer to support additional technology in the buildings;

- Additional personnel recruiters and staff;

- Additional support in the finance department; and

- An outside evaluator to design an EIP II evaluation system and monitor the programs' outcomes and inputs.

The Court Monitor, after receiving recommendations from the parties, shall recommend to the Court, who shall be designated to serve as the outside evaluator and to furnish further details with respect to the jurisdiction of the outside evaluator, frequency of reports, compensation and other related issues.

The evaluation process will monitor progress made under this Order in eliminating vestiges by monitoring achievement gaps between minority and non-minority students, disparate suspension rates for minority and non-minority students, disparate referrals to special education, disparate graduation rates, under-representation of minority students in high level classes, and low numbers of minority students receiving Regents Diplomas and attending college. Qualitative evaluation of the conditions and practices affecting these indicators or student outcomes shall also be performed and the results submitted to the Court Monitor and the parties no less frequently than annually. The types of data and the questions for evaluation shall be consistent will those outlined in EIP II and with the goals of this Order.

## VI. IMPLEMENTATION

1. It is not feasible to implement fully the additional relief provided in this Order simultaneously in all of the public schools in Yonkers. For that reason, the Yonkers Board has proposed beginning full implementation of EIP II in approximately eight schools in 1998–99 and continuing with full implementation in additional schools in subsequent years until implementation is complete. The Yonkers Board has represented to the Court that it will explore ways and take all available steps to expedite full implementation of EIP II in all schools at the earliest feasible date. Consistent with that proposal and representation, the Court directs that the steps set forth herein shall be taken.

2. Within 14 weeks after the entry of this Order, the Yonkers Board shall present to the Court Monitor and the other parties a budget for implementing the EIP II remedy, consistent with the above provisions of this Order, for the 1998–99 school year. That budget shall include or reflect the following: (i) an identification of those schools in which the Yonkers Board will begin full implementation of EIP II in 1998–99; (ii) for each of the schools so identified, a more specific determination of how the various components of EIP II will be implemented beginning in 1998–99, consistent with the above provisions of this Order, with the more specific determi-

nations to be made with input of the administrators, other professional staff, and parents of the school in question, subject to review and approval of the Superintendent of Schools and the Yonkers Board; (iii) for the remaining schools not so identified, a specific determination of what steps will be taken during the 1998–99 school year to promote the objectives of this Order and to prepare those schools for full implementation of the EIP II remedy in future years; (iv) a more specific determination of how the provisions of this Order relating to District supports and District-wide activities will be implemented during the 1998–99 school year; and (v) the funding that will be required for implementing various components of this Order during 1998–99.

3. Any party that wishes to submit to the Court Monitor written comments on or objections to the EIP II budget for 1998–99 may do so within ten days of its receipt. The Court Monitor will then undertake to resolve any questions or disagreements raised by any party through discussion. The Court strongly urges the parties to work cooperatively and with the Monitor to resolve any issues and to permit prompt implementation of this Order.

4. On or before March 31, 1998, the Monitor shall forward to the Court the Yonkers Board's EIP II budget for 1998–99, reflecting any agreed upon changes made as a result of comments of other parties and discussions with the Monitor. The Monitor also shall provide the Court at that time with recommendations on the resolution of any issues pertaining to the budget on which the parties remain in disagreement. The Monitor further shall provide the Court with a recommendation as to how the implementation of EIP II shall be funded. To the extent necessary, the Monitor may receive evidence or additional submissions in order to facilitate his recommendations.

5. Upon receipt of the Yonkers Board's EIP II budget for 1998–99 and the Monitor's recommendations, the Court will enter an Order providing for the funding of the remedy. Although a decision on the appropriate funding of the additional remedy will not be made until receipt of the Monitor's recom-

mendations, the instant Order is a full and final adjudication of the scope of the additional desegregation remedy needed to eliminate vestiges of segregation in YPS to the extent practicable.

6. The Court anticipates that the process for planning, comment, discussion, recommendations, and decision described above with respect to 1998–99 will resolve most if not all issues relating to future implementation and funding of EIP II. Thus, the Court anticipates that in future years the State will be able to work together with the City and the Yonkers Board, consistent with the normal processes for education planning and budgeting, to provide for the continued implementation of EIP II. To assist and ensure the prompt completion of the implementation process in future years, the Yonkers Board will present to the Court Monitor and the parties a budget for implementing the programmatic components of EIP II in the upcoming school year by December 31 of each year. If any party notifies the Court Monitor within ten days of receiving the budget of an issue on which it may wish to seek further direction from the Court, the Monitor shall establish a schedule that allows for discussion and any further recommendations by the Monitor to the Court on or before January 31 of the year. Again, the Court strongly urges the parties to work together to minimize the extent to which further direct involvement by the Court is required.

7. Within 14 weeks of the entry of this Order, the Yonkers Board shall prepare a separate plan that sets forth how the capital facilities needs associated with implementation of EIP II will be met during the 1998–99, 1999–2000, and 2000–01 school years. Once completed, copies of that capital facilities plan shall be served on all of the parties to this action and provided to the Court Monitor. The Court Monitor shall establish a schedule for the receipt of written comments and, if necessary, the receipt of additional evidence or argument concerning the capital facilities plan. On or before March 31, 1998, the Court Monitor shall provide the Court with a report and recommendations on how the capital facilities needs associated with the implementation of EIP II should be

provided for during the next three school years. Any additional future capital facilities needs relating to this Order shall be raised in the first instance with the Monitor and brought to the attention of the Court as necessary.

8. Beginning immediately upon the entry of this Order, the Yonkers Board shall begin and/or expedite efforts to develop curricula needed for the effective implementation of EIP II instructional programs, as called for in the above provisions. In a number of areas, such curricula must be ready by the beginning of the 1998–99 school year in order for implementation of EIP II to begin next year. The Yonkers Board also shall begin immediately to put in place the staff recruitment and selection component discussed above, so that the District can begin to realize the advantages of that component in supporting the objectives of the expanded remedy in 1998–99. Finally, the Yonkers Board shall take steps to prepare for the introduction of additional technology in schools as called for by this Order. The initiation of these activities cannot await even the completion of the 1998–99 budget discussed above.

9. It is undisputed that planning activities required to prepare the EIP II budget for 1997–98 and the capital facilities plan as well as the immediate initiation of the EIP II components identified in the preceding paragraph will require substantial resources. The State's own witnesses have testified to the significant efforts that will be required to undertake and complete these activities in an effective manner. The Court has accepted Superintendent Marra's undisputed testimony, based upon work of his staff, that the efforts required in these areas over the next 14 weeks will necessitate the expenditure of approximately $450,000, most of which will be for teacher and staff work outside normal hours. The Court further has accepted Superintendent Marra's testimony that the Yonkers Board does not currently have available in its budget sufficient funding to support these activities.

10. Accordingly, and because the State has not yet provided any funding or resources specifically dedicated to implementing the desegregation remedy in this case, the Court hereby orders the State, within 10 days of the entry of this Order, to make available to the Yonkers Board funding in the amount of $450,000 to support the activities that the Court has ordered the YBE to undertake within the next 14 weeks. The State may establish appropriate mechanisms to satisfy itself and the Court that the funding provided pursuant to this paragraph is used for the purposes set forth in this Order. Such mechanisms shall not, however, delay access by the Yonkers Board to the funding in question or otherwise impede the YBE in carrying out the requirements of this Order.

11. In the event that any appellate court shall stay the direction to the State contained in paragraph VI(10) hereof, then the City of Yonkers shall provide the funding for this planning process without prejudice to the right of the City to seek refund of some or all of such funds when said stay is lifted. The planning called for in the proceeding paragraph shall, in any event, go forward.

12. The evidence before the Court suggests that, as the parties move forward with implementation of EIP II, experience may lead to the identification of beneficial refinements or adjustments that should be made in the remedy. This is to be expected in light of the systemic nature of the vestiges of segregation that exist in YPS and the resulting dynamic nature of the remedy. To facilitate such refinements and adjustments in EIP II, any party shall be permitted to seek modification of the provisions of this Order as further provided herein.

13. If the Yonkers Board or any other party identifies a desired refinement or adjustment to the remedy that would require modification of this Order, it shall notify the Court Monitor and the other parties in writing of the refinement or adjustment and of the provision of this Order that it requests be modified. If no party submits a written objection to the Court Monitor within ten days of service of the said notice, then the Monitor shall forward the notice to the Court, and the Yonkers Board shall be free to make the desired refinement or adjustment. If one or more parties submits a written objection to the requested modification, then the Court Monitor shall schedule

discussions and proceedings, as appropriate, and, upon completion, forward to the Court a report and recommendation on how any remaining disagreement among the parties should be resolved.

14. This Order represents a final and appealable determination by this Court of the scope of the additional remedy needed to eliminate to the extent practicable the vestiges of the prior dual school system that this Court has found continue to exist in YPS.

The Clerk is directed to enter in the docket of the Court a final judgment consistent with this Order.

SO ORDERED.