YONKERS BRANCH–NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., Plaintiffs–Intervenors–Appellees,

v.

CITY OF YONKERS, Yonkers Board of Education, Defendants–Appellees–Cross–Appellants,

The State of New York, et al., Defendants–Appellants–Cross–Appellees.

Docket Nos. 98–6190L, 99–6128CON, 98–6199XAP, 99–6132CON, 99–6074CON, 00–6158CON.

United States Court of Appeals, Second Circuit.

Argued: March 21, 2001.

Decided: May 9, 2001.

Denise A. Hartman, Asst. Solicitor Gen., Albany, N.Y. (Eliot Spitzer, N.Y. State Atty. Gen., Nancy A. Spiegel, Asst. Solicitor Gen., Peter H. Schiff, on the brief), for defendants-appellants-cross-appellees.

Raymond P. Fitzpatrick, Jr., Birmingham, AL (R. Scott Clark, Fitzpatrick, Cooper & Clark, on the brief), for defendant-appellee-cross-appellant City of Yonkers.

Stephen Bergstein, Goshen, N.Y. (Michael H. Sussman, on the brief), for plaintiff-intervenor-appellee Yonkers Branch–NAACP.

Steven J. Routh, John Borkowski, John J. Clasby, Hogan & Hartson, Washington, DC; Lawrence W. Thomas, Donoghue, Thomas, Auslander & Drohan, Yonkers, NY, submitted a brief for defendant-appel-

lee-cross-appellant Yonkers Board of Education.

Before NEWMAN, PARKER, and SACK, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal concerns the proper allocation between New York State and the City of Yonkers ("City") of expenses of complying with court orders for the desegregation of public schools in Yonkers. Also at issue is the proper allocation of revenues received from the federal government and whether certain aspects of the District Court's recent remedial orders exceed the Court's discretion. The State of New York appeals from several orders of the District Court for the Southern District of New York (Leonard B. Sand, District Judge). The City and the Yonkers Board of Education ("YBE") cross-appeal. We affirm in part and dismiss in part.

### Background

#### I. Procedural History

In 1980, the United States commenced this action in the Southern District of New York against the YBE and the City, alleging unconstitutional segregation of the Yonkers schools. The NAACP later intervened as a plaintiff. In 1985, Judge Sand found that the schools were segregated, and that the segregation was the result of intentional segregation. *See United States v. Yonkers Board of Education*, 624

F.Supp. 1276 (S.D.N.Y.1985) ("*Yonkers I*").[1] In 1986, Judge Sand approved the "Educational Improvement Plan" ("EIP I") recommended to him by the judicially-appointed Monitor. *See Yonkers Branch v. Yonkers Bd. of Educ.*, 635 F.Supp. 1538 (S.D.N.Y.1986) ("*Yonkers II*"). *Yonkers I* and *Yonkers II* were affirmed. *See United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181 (2d Cir.1987) ("*Yonkers III*"). EIP I recommended school closings, magnet schools, voluntary busing, and student and staff reassignment. The City and the YBE immediately began implementing this plan.

In 1987, the YBE amended its answer to add the State as a defendant and cross-claimed against the State, alleging the State's complicity in the segregation. After extensive motion practice, the District Court began holding a trial in 1993 in three parts to decide (1) whether vestiges of segregation remained after implementation of EIP I; (2) whether the State was liable for these vestiges; and (3) what remedy, if any, would be appropriate, in addition to EIP I. First, in 1993, the District Court found that desegregation had been achieved with respect to enrollments, but that "vestiges" of segregation remained, and required a remedy. *See United States v. City of Yonkers*, 833 F.Supp. 214 (S.D.N.Y.1993) ("*Yonkers IV*").[2] Second, in 1995, the District Court decided that the State knew about segregation and failed to take corrective mea-

---

**1.** This and all subsequently published decisions in the *Yonkers* litigation will be referred to only by the short-form designation "*Yonkers*" followed by the roman numeral used both by the panel that decided the most recent case in this Court, *see Yonkers VII*, 197 F.3d 41 (2d Cir.1999) and by Judge Sand in his decision on remand from *Yonkers VII*, *see Yonkers VIII*, 123 F.Supp.2d 694 (S.D.N.Y. 2000). That numbering does not assign a roman numeral to one of the published decisions, the District Court's 1995 decision, re-

ported at 880 F.Supp. 212, a decision reversed in *Yonkers V*, 96 F.3d 600 (2d Cir. 1996).

**2.** A desegregation remedy is not complete until "vestiges" of segregation that have a present discriminatory effect have been eliminated. *See United States v. Fordice*, 505 U.S. 717, 728, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992).

sures, but that this nonfeasance was an insufficient basis for liability; the claims against the State were dismissed. *United States v. City of Yonkers (unnumbered)*, 880 F.Supp. 212 (S.D.N.Y.1995). We reversed, ruling that the State could be held liable for nonfeasance, but we did not review the propriety of the vestiges finding itself. *See United States v. City of Yonkers*, 96 F.3d 600 (2d Cir.1996) ("*Yonkers V*"). This reversal led to the third part of the inquiry Judge Sand had contemplated in 1993.

In 1997, the District Court held a trial on remedy for the State's liability, with an updated inquiry into the 1993 vestiges finding. Judge Sand found that vestiges of segregation persisted, in the form of low teacher expectations and insufficiently multi-cultural teaching techniques and curriculum. He then approved the Monitor's "EIP II" programs as a remedy for these vestiges. *See United States v. Yonkers Bd. of Educ.*, 984 F.Supp. 687, 695–98 (S.D.N.Y.1997) ("*Yonkers VI*").[3] *Yonkers VI* also approved a 50–50 split between the City and the State for EIP I costs for FY 1997 (ending June 30, 1997), and determined that the State should receive only partial credit against its FY 1997 liability for its magnet school aid to Yonkers. *See id.* at 695. The State appealed *Yonkers VI*, seeking review of the vestiges finding, the EIP II remedy, and the denial of full credit to the State for State magnet school aid in FY 1997. During the pendency of that appeal (adjudicated in *Yonkers VII*), the State did not seek a stay, and EIP II was implemented.

Between the District Court's decision in *Yonkers VI* and this Court's decision in *Yonkers VII*, the District Court took five actions, reflected in separate opinions and orders that are among the subjects of the pending appeals now consolidated before this panel. These opinions and orders created a general framework for dividing costs between the City and the State through 2006, assessed the City and the State the costs for EIP I and EIP II for FY 1998 and FY 1999, and disallowed the State's claims for certain credits. The five actions are:

- First, a June 15, 1998, opinion and an implementing July 27, 1998, order. Judge Sand captioned this order the "EIP Funding Order," but the parties refer to it (and the opinion on which it is based) as the "Formulaic Funding Order" (or "FFO"), and we will use their terminology. The FFO maintains the 50–50 cost-sharing principle (provisionally implemented for FY 1997 in *Yonkers VI*) for the nine-year interval from 1997 to 2006. However, in recognition of the City's current financial difficulties, the FFO requires the State to pay higher percentages in the early years and the City to pay higher percentage in the later years, achieving the 50–50 split on a cumulative basis. This opinion and order are appealed in No. 98–6190 and cross-appealed in No. 98–6199.

- Second, a November 25, 1998, order, which approved the Monitor's October 29, 1998, recommendation to deny the State partial credit for a federal magnet school grant for FY 1997. This order and similar rejections of a partial credit for federal magnet school grants for subsequent years are ap-

---

3. *Yonkers VI* also rejected the contention that EIP I's goals had been "fully accomplished." The Court noted that EIP I sought to obtain for minority children not merely physical integration with White students, but "similar educational opportunities and experiences." In addition, EIP I had failed to achieve its goal of ameliorating "racial attitudes, student discipline procedures [and] academic achievement...." 984 F.Supp. at 694.

pealed in Nos. 98–6190, 99–6128, 99–6132, and 00–6158.

- Third, a February 25, 1999, order, the "EIP II Modification Order," which approved certain modifications to EIP II sought by the YBE, adding certain programs and removing others. This order is appealed in No. 99–6074.
- Fourth, an April 5, 1999, order, the "FY 1998 Funding Order," which directed the State to pay $11,632,453[4] to cover EIP I costs for FY 1998 (EIP II had not yet started). Although *Yonkers VI* had given the State a partial credit for its annual magnet school aid against its EIP I liability for FY 1997, this order denied the State any credit for State magnet school aid for FY 1998, a practice that has been repeated in subsequent fiscal years. The State also received no credit for any of Yonkers' federal magnet school aid. This order is appealed in No. 99–6128.
- Fifth, an April 15, 1999, order, the "FY 1999 Funding Order," which directed the State to pay $69,108,227 as its share of anticipated unpaid EIP costs for FY 1999. Because EIP II was launched in FY 1999, these costs included EIP II costs for the first time, in addition to ongoing EIP I costs. As in FY 1998, the State received no credit for state or federal magnet school aid. This order is appealed in No. 99–6132.

After these opinions and orders were entered, this Court on June 22, 1999, decided *Yonkers VII*, initially reported at 181 F.3d 301. Notwithstanding the intervening orders dealing mainly with FY 1998 and beyond (which are the principal subjects of the pending appeal), the review in *Yonkers VII* was limited to issues raised by *Yonkers VI*, including Judge Sand's vestiges finding, his EIP II remedy, and his apportionment of FY 1997 EIP costs. *Yonkers VII* held that the finding of vestiges was erroneous and vacated the EIP II remedy. *See id.* at 309–18. We upheld the decision to apportion EIP I costs evenly between the parties for FY 1997 and to deny full credit for State magnet school aid for FY 1997. *See id.* at 320. The NAACP petitioned for rehearing, and at this point the State sought for the first time, and obtained on August 5, 1999, a stay of implementation of the EIP II remedy. On rehearing, on November 16, 1999, we vacated our original opinion in *Yonkers VII* and remanded the case to afford Judge Sand the opportunity to identify specific "vestiges" of segregation that might justify the EIP II remedy. *See Yonkers VII*, 197 F.3d 41 (amended opinion). We also vacated EIP II, noting that

> there has been no adequate showing that [EIP II] is responsive to the only ill that counts for purposes of this litigation: *de jure* segregation and its aftereffects. Measures such as networked computers in classrooms and full-day pre-kindergarten are more properly characterized as general educational enrichments rather than remedies for prior segregation.

*Id.* at 56. The amended opinion reconfirmed the allocation of EIP I costs for FY 1997. *See id.* at 57–58.

Prior to deciding the vestiges issue (and the consequent justification for EIP II) on remand, the District Court issued an opinion on April 13, 2000, adopting the Monitor's April 3, 2000, recommendations. These recommendations determined the final amounts owed by the State and the

---

4. The State contends the required payment is $11,321,557. *See* Brief for State Defendants at 2.

City for FY 1999 costs (which included EIP II costs incurred prior to our August 5, 1999, stay of EIP II expenditures) and apportioned EIP I costs for FY 2000. The Monitor also recommended, and Judge Sand approved, adding a universal pre-kindergarten program to EIP I for FY 2000; this program had previously been part of the EIP II remedy vacated by *Yonkers VII*. This opinion also rejected the State's request for credit to reflect State categorical funding and partial credit for federal aid obtained independently of the City. On April 17, 2000, the District Court entered an order, the "2000 Funding Order," which directed the State to pay $44,306,368 as its share of unpaid EIP costs for FY 2000. This order and the prior April 13 opinion are appealed in No. 00–6158.

In November 2000, after the appeals in the pending case had been filed and consolidated, Judge Sand ruled with respect to the remand in *Yonkers VII*. *See United States v. Yonkers Bd. of Educ.*, 123 F.Supp.2d 694 (S.D.N.Y.2000) ("*Yonkers VIII*"). Judge Sand found vestiges of discrimination in practices related to academic tracking, disciplinary practices, administration of special education, pupil personnel services, and services for students with limited proficiency in English. He also found that "EIP II is no longer a feasible option," since it was not directed to current conditions. Judge Sand referred the case to the Monitor to hold proceedings and to determine a revised remedy. The issues raised by *Yonkers VIII* are not part of the instant appeal, although *Yonkers VIII* developments will bear on our treatment of issues raised by the earlier orders.

On this appeal, the State claims: (1) that state magnet aid and other state categorical aid should be credited against the State's EIP I liability for FY 1998, 1999, and 2000; (2) that federal magnet school and class-size reduction aid should partly be credited against the State's EIP I liability for the same fiscal years; (3) that the State should get a credit for EIP II expenses for FY 1999 charged to the State in the District Court's April 15, 1999 order; (4) that the FFO should be modified; and (5) that the universal pre-kindergarten program should not have been shifted from EIP II to EIP I for FY 2000. The parties essentially agree that the EIP II Modification Order should be vacated, since EIP II was vacated by *Yonkers VII*.

## Discussion

### I. Credit for State Magnet School Aid Against EIP I Expenses

In No. 99–6128, the State contends that the FY 1998 Funding Order was erroneous because it failed to give the State credit for magnet school aid that the YBE was receiving from the State pursuant to a statewide magnet aid program. This claim is also asserted in No. 99–6132 as to the FY 1999 Funding Order and in No. 00–6158 as to the FY 2000 Funding Order. These magnet school grant credits would be worth between $10 and $15 million annually. The State argues that since one purpose of the state magnet school program is to combat segregation, the state aid is essentially a voluntary contribution to EIP I. The State contends that Judge Sand's rejection of its credit claim violates the law of the case and exceeded the Court's discretion.

#### A. Background of the Magnet Aid Credit Claim

The contentions with respect to law of the case and the merits of the State's claim for magnet school credit will be illuminated by review of how the issue has been treated in the decisions preceding the orders now on appeal. The problem of cred-

its for state magnet aid first came up in allocating the financial burdens for FY 1997. The Monitor struggled with the question of whether State magnet aid should be counted as remedial, and thus creditable against the State's EIP burden, or whether it was merely an attempt by the State to "equalize basic aid to education." *Yonkers VI*, 984 F.Supp. at 707 (appended Monitor's opinion). On the one hand, magnet aid is often granted to advance racial integration, and State magnet aid for Yonkers had gone up dramatically over the last 15 years, and was much higher than the amounts received by comparable cities. Yonkers had been asking the legislature for more money to implement court-ordered remedies, so the increase in magnet aid was arguably intended for this purpose. On the other hand, the magnet aid increases could also be seen as attempts to use magnet aid merely to compensate for Yonkers' low funding levels, compared to other cities. Moreover, State law imposed "transition caps" on the amount by which changes to the basic "operating aid" formulas could increase any school district's operating aid from year to year, and because the transition cap in FY 1997 had prevented Yonkers from collecting $20 million in operating aid that would otherwise have flowed automatically, it was arguable that magnet aid was being used to make up for basic funding inequities notwithstanding the cap.

The Monitor concluded that both factors were at work:

> [E]vidence exists to indicate that the State's categorical aid to Yonkers in the form of magnet program grants may be intended to serve at least two purposes: magnet program support and an *ad hoc*, discretionary effort spawned by annual budget negotiations to compensate for generally accepted flaws in the State's basic funding formula for education.

*Id.* To divide the State magnet aid into the portion intended for desegregation efforts and the portion intended for general "operating aid" purposes, the Monitor thought that the portion for general "operating aid" purposes should be assumed to be the amount of funds that the City lost because of the transition cap. For FY 1997, the cap prevented Yonkers from receiving $20 million of general education aid. Therefore, of the $29.5 million in state magnet aid, only $9.5 (ultimately determined to be $9.855) million was considered to be magnet aid, for which the State received credit. *Id.* at 710–11. The Monitor emphasized, however, that this approach would not necessarily be used in future years, noting that there was no State oversight ensuring that the aid would be spent in any particular way, and that the aid was discretionary with the legislature and could be reduced or withdrawn at any time. *Id.* at 709. The District Court approved: "The issue is not one of the subjective intent of the legislature but rather what the objective facts show to be the effect of the State funding, the method by which the amount of funding is determined, the lack of any assurance of continuity and of any specific direction as to the application of such funding." *Id.* at 695 (District Court's opinion).

Eight months later, in the opinion underlying the Formulaic Funding Order,[5] the District Court suggested a complete rejection of magnet aid credit and established the principle that only EIP costs were to be shared by the State, rather than some percentage of the whole YBE budget, as the Monitor had recommended. Judge Sand noted that this approach would encourage the City and the YBE "to treat as many expenditures as possible as

---

5. The FFO is before us on this appeal, although that order was entered prior to our decision in *Yonkers VII*, upholding the apportionment of FY 1997 costs in *Yonkers VI*.

EIP I expenditures, creating . . . categorization problems." Anticipating that the magnet issue would arise, the FFO opinion said that time would "illuminate" the problem, but also said that it was the Court's "assumption . . . that the State will make its determinations concerning the grants of State aid independently of EIP I and EIP II contributions and that there is no need for this item to be included in the equation."

A few months later, State magnet aid credit was denied entirely in the 1998 Funding Order confirming the State's share of FY 1998 costs, one of the orders now on appeal. The Monitor recommended denying credit, but noted for the future that any "significant[] increase[s]" in State discretionary aid might raise "fairness" issues and result in credits for the State; decreases in such aid could result in a finding that the State was not "maintaining effort" as required by the FFO.[6] The Monitor also noted that "the Court's future burden apportionment process should not intrude upon nor be adversely affected by the regulatory, political, and economic forces which shape the logic of State aid." The District Court concluded that it did not yet have "an adequate [factual] basis for definitive resolution of the issue." The Court nonetheless adopted the Monitor's recommendation for FY 1998. The State therefore received no credit for magnet aid for that year.

After the District Court issued this ruling, we rejected the State's argument that it should have gotten full credit for State magnet aid in FY 1997. *Yonkers VII*, 197 F.3d at 58. However, even though we were actually upholding a partial credit to the State for FY 1997, we rejected the State's claim in broad terms:

> A related issue is the State's argument that it makes a substantial annual contribution through magnet school aid (as the State does in other large school districts), and that any required State contribution to EIP I should be offset by the magnet school contribution, which has a remedial tendency and purpose. The district court refused to reduce the state's liability for EIP I by the amount of the magnet aid, a decision the state argues is unfair and an unwarranted intrusion into state sovereignty. We conclude that it was not an abuse of the court's broad discretion to deny the State credit for payments it has already made to Yonkers through magnet school grants. In making its decision, the Court did not re-characterize the subjective intent of the legislature, as the State argues, but instead determined that this money did not have the effect of funding the ordered remedy. We do not find that conclusion to be clearly erroneous.

*Id.*

### B. Law of the Case

Against this background, each side contends that our decision in *Yonkers VII* establishes law of the case in its favor on the issue of the proper State credit for magnet school aid. The State points out that, although it sought review of the District Court's refusal to credit the entire $29.5 million of magnet school aid, no party challenged the State's entitlement to a credit for the amount by which the State's

---

6. The FFO states:

   Both the City and State defendants inherit an obligation . . . to maintain YBE budgetary effort beyond ordered funding. . . . Should the Court find that one or both parties have failed to maintain budgetary effort and that such failure has been or will be adverse to the effectiveness of the remedy, the Court may order a revision in the remedy apportionment ratio and/or the amount of EIP funding.

magnet payment exceeded the amount of "operating aid" funds the City lost because of the transition cap, and our decision in *Yonkers VII* affirmed the resulting credit of $9.855 million. The City of Yonkers and the YBE respond that we rejected the State's claim for credit, citing our statement that "it was not an abuse of the [district] court's broad discretion to deny the State credit for payments it has already made to Yonkers through magnet school grants." *Yonkers VII*, 197 F.3d at 58.

Neither side persuades us that the law of the case has been established for this appeal. Although we upheld the District Court's discretion to deny magnet aid credit while simultaneously affirming the allowance of a partial credit, we were reviewing the funding order for FY 1997. We will take appropriate guidance from the views expressed in *Yonkers VII*, but that decision is not technically law of the case for funding allocations in later years, either to assure the State at least a partial credit or to assure Yonkers that there will be no credit.

### C. The Merits of the State's Credit Claim

■ As we indicated in *Yonkers VII* in discussing a credit for FY 1997 funds, the State's entitlement to credit turns on whether the money has the effect of funding the ordered remedy. As the Monitor and the District Court have recognized, it is not easy to determine whether some State funds are paying for the Court-ordered remedy. At one extreme, the State would clearly be entitled to a credit if the legislature appropriated new money explicitly to pay the State's share of any court-ordered desegregation money. At the other extreme, there would be no valid claim if the State simply sought a credit for some portion of the funds that Yonkers

received as its share of the comprehensive operating aid that the State extends to all communities, based on student attendance and school district wealth; if the State received a credit for some of the dollars routinely paid as so-called general formulaic aid just because those dollars were available to be spent by Yonkers on EIP items, the State would not be doing anything to remedy its equal share of liability. Moreover, Yonkers could always contend that fungible State dollars were paying for non-EIP costs. The issue is far less clear when the State appropriates money for a categorical magnet school program that serves both to enhance the quality of education generally and to promote racial diversity, thereby lessening the effects of past segregation, whether or not intentionally.

■ Ideally, the District Court would try to determine precisely how many State dollars were sent to Yonkers to remedy past segregation, so as to entitle the State to a credit. Unfortunately, that inquiry will rarely yield a clear answer. Too many variables prevent certainty, including the *different motivations* of the legislators in appropriating funds for a particular program, the ground-rules for funding eligibility, the way the program is administered, the purposes of the program, and its likely and actual effects. Faced with such a perplexing inquiry, a District Court, exercising its broad discretion to fashion a desegregation remedy, *see Green v. County School Board*, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Yonkers VII*, 197 F.3d at 57–58, may reject a claim for State credit unless it is clear that the State is providing the aid almost exclusively to remedy past segregation. The fact that the aid, while enhancing educational quality, coincidentally promotes racial diversity does not require a District Court to consider the payment as funding for a

desegregation remedy, although a decision to award the State a full or at least a partial credit in such circumstances would likely be within the Court's discretion.

■ Where liability has been established, the risk of uncertainty in calculating damages falls upon the wrongdoer, *see Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Western Geophysical Co. of America v. Bolt Associates, Inc.*, 584 F.2d 1164, 1172–73 (2d Cir.1978), and this rule suggests that a tortfeasor must have compelling evidence to sustain an appellate challenge to an apportionment of costs among tortfeasors. We accorded the District Court broad discretion as to apportionment in *Yonkers VII* and do so here as well, even though that Court has concluded that the partial credit allowed for magnet school payments in FY 1997 should no longer be allowed.

## II. State Credit for Other Categorical State Aid

■ In No. 00–6158, the State seeks review of the District Court's decision, expressed in its opinion of April 13, 2000, and reflected in the FY 2000 Funding Order, to deny the State credit for State categorical grants made under four statewide aid programs. These grants to Yonkers supported universal pre-kindergarten in FY 1999 and FY 2000, class size reduction in FY 2000, extended day programs in FY 1999 and FY 2000, and technical grants in FY 1999. The Monitor's calculation of sums due from the State apparently denied the State the requested credits, although very little was said on the subject. He noted that the broad issue of credit for state legislative aid to education had not

been resolved by the District Court and that "State aid to education seems to be waxing more consonant with the design of the [desegregation] remedy." Neither the District Court's April 13, 2000, opinion approving the Monitor's FY 2000 recommendations nor the ultimate FY 2000 Funding Order explicitly reckoned with the State's claim for categorical grant credits.

Although we would have preferred some articulation of the District Court's reasons for disallowing these categorical grant credits and will require such explanation if the issue recurs in the future, we will assume that the Court regarded the State's claim for credits for these grants as standing on the same basis as the claim for credits for the State magnet school grants. Like the magnet school grants, these categorical grants serve both to enhance education generally and to promote some objectives of EIP I, but the relationship to the latter purpose is not so direct as to require the District Court to regard them as desegregation grants entitling the State to credit.

## III. State Credit for Federal Magnet School Aid

■ In Nos. 99–6128, 99–6132, and 00–6158, the State contends that Judge Sand erred in the treatment of $1.9 million in *federal* magnet school aid currently being awarded to the City each year in grant money available only to school systems that are implementing court-ordered or agency-ordered desegregation. *See* 20 U.S.C. § 7205 (1994). In October 1998, the Monitor recommended denial of the State's motion for a credit for half the federal magnet school aid for FY 1997.[7] He reasoned that it was fair to let the City

---

7. The State had already paid its FY 1997 bill, but sought to have half the federal magnet school aid paid for that year credited against future judgments. The District Court, in an order dated February 10, 1998, had previously left open the possibility of future adjustments in the event that unresolved State contentions were upheld.

keep the money since it was the City that had applied for it, and since a finders-keepers rule provided maximum incentive to explore outside sources of funds. In November 1998, Judge Sand adopted the Monitor's recommendation and reasoning.[8]

The State renews on appeal its claim to benefit equally with Yonkers from the federal magnet school grants, which, unlike the state magnet school grants, are targeted solely to school districts implementing court-ordered desegregation remedies. The State argues that giving Yonkers the entire benefit of the federal grant departs from the 50–50 formula, is unfair to the State since only cities can apply for these federal funds, and fails to recognize that Yonkers will retain a substantial incentive to seek outside funding even if it derives only a 50 percent benefit. Whatever the force of these arguments, they are not so compelling as to require their acceptance by the District Court. The Court's acceptance of the Monitor's reasoning for denying the State's claim was within the Court's discretion.

## IV. State Credit for Federal Class Size Reduction Aid

In No. 00–6158, the State seeks the credit for one half of the $1,090,000 that Yonkers received for FY 2000 as its share of the $104.5 million that New York received from the federal government under a categorical grant program to help reduce class size. *See* Consolidated Appropriations Act, 2000, § 310, Pub.L. No. 106–113, 113 Stat. 1501A. Rejection of this credit is affirmed for the same reasons as the claim of credit for the federal magnet school grant.

## V. State Credit for FY 1999 EIP II Costs

In No. 99–6132, the State contends that it is entitled to a credit for the portion of its contribution to the FY 1999 Funding Order that was spent on EIP II projects, a total of $24.7 million. The State argues that it is entitled to this credit because EIP II and the liability finding underlying it were vacated in November 1999 by the amended opinion in *Yonkers VII*. The Appellees oppose such a credit. They note that EIP II programs were fully funded by the City in FY 1999 pursuant to the District Court's order: even the initial opinion in *Yonkers VII* did not come down until a few days before FY 1999 ended, and the State did not apply for a stay of EIP II until afterward (when the rehearing petition was pending). The Appellees also note that although the State's costs were paid to the City, the true beneficiaries of the State's EIP II payments were the schoolchildren, not the City, and that it would be inequitable to require the City to give the State a future credit for these State payments.

This claim should be considered in the first instance by the District Court. Until such consideration, the issue is not ripe for our determination. Accordingly, that portion of the appeal in No. 99–6132 seeking review of the denial of State credit, against FY 1999 liability, for EIP II costs is dismissed, without prejudice to an application to the District Court to give the State such a credit against future spending obligations.

## VI. The EIP II Modification Order

In No. 99–6074, the State contends that the EIP II Modification Order, approved

---

**8.** Judge Sand noted that the issue for FY 1997 could not be resolved based on the intent of the federal donor because the federal grant was made before the City had begun sharing remedial costs with the State. He urged the parties to pursue joint federal applications in the future, fully disclosing their cost-sharing obligations.

by Judge Sand on February 25, 1999, should be vacated because the original EIP II ruling in *Yonkers VI* has been vacated in *Yonkers VII* along with the underlying liability findings. The City and the NAACP do not object, but the YBE argues that any claim against the EIP II Modification Order will not be ripe until the proper scope of any vestiges remedy is determined by the District Court on remand. Since Judge Sand has already indicated that the new vestiges remedy will be distinct from EIP II, the appeal from the EIP II Modification Order is moot. Accordingly, the appeal in No. 99–6074 is dismissed as moot, and the District Court is directed to vacate the EIP II Modification Order.

## VII. Revision of the Formulaic Funding Order

In No. 98–6190, the State contends that the Formulaic Funding Order, entered July 27, 1998, and still in effect for EIP I costs (and presumably for any of the EIP II costs for FY 1999 for which the State does not ultimately obtain reimbursement), must be remanded for reconsideration. The State argues that the front-loaded allocation formula, achieving a cumulative 50–50 split by FY 2006, must be revised because the projected funding schedule was premised in part on the now vacated EIP II. In No. 98–6199, the City has cross-appealed from the FFO to contend that the State should pay 80 percent of EIP II costs, instead of the cumulative 50–50 split that the FFO applied to both EIP I and II costs.[9] It is not clear whether the City is seeking the 80 percent allocation only for FY 1999 EIP II costs for which the State does not ultimately receive reimbursement credit or also for whatever costs (whether

identified as EIP II or some new designation) that the District Court might require as a remedy for a revised vestiges finding.

With EIP II vacated and a vestiges remedy not yet in place, the parties' contentions are not ripe for our consideration. Accordingly, the appeal in No. 98–6190 and the cross-appeal in No. 98–6199 are dismissed, without prejudice to applications to the District Court for revision of the FFO.

## VIII. The Shift of FY 2000 Funds for Universal Pre–K from EIP II to EIP I

In No. 00–6158, the State seeks review of the provision of the District Court's FY 2000 Funding Order that shifted universal pre-kindergarten costs from EIP II to EIP I for FY 2000, after EIP II had been vacated by *Yonkers VII*. EIP I had established pre-kindergarten programs only at particular schools, and in 1997 700 children were on a waiting list. All the parties appear to agree that universal pre-kindergarten had not been ordered until EIP II, and was shifted to EIP I only because EIP II had been vacated. The State argues that the shift was an unwarranted circumvention of our decision vacating EIP II.

In recommending the shift, the Monitor relied on a letter from the School District's Executive Director of Finance, which explained:

In order to make Pre–K available to all students and make the class size uniform and equitable in accordance with State and District initiatives, additional funding was required and requested as part of the EIP II budget, notwithstanding the fact that the program

---

9. The YBE also cross-appealed in No. 98–6199, but makes no claims for affirmative relief in its brief.

was historically an EIP I initiative. (At that time, the distinction was not important because both EIP I and EIP II were in operation.) Planning for the expansion and modification of the Pre–K program was accomplished, and the necessary teachers were hired. When the EIP II decision was rendered by the Court of Appeals, the District was faced with the choice of laying off teachers and creating inequity in the Pre–K program or finding another funding source. For this reason, the incremental funding needed for this Pre–K program expansion was shifted back into EIP I, where the rest of the Pre–K costs reside.

The Monitor also noted that after the *Yonkers VII* ruling vacating EIP II, the parties had agreed "that the District would exercise restraint in EIP II expenditures in all cases but those where commitments were already in place (e.g., staff hirings, parental expectations) and where a loss of program momentum would not be in the best interest of the District and the remedy." He then concluded that the shift of universal pre-K to EIP I was done solely to maintain the effectiveness of the limited pre-K programs already in EIP I. Judge Sand approved the Monitor's recommendations without comment on this issue, noting only that "[t]he State's concern that the Monitor's report will be the basis for future appropriations, *i.e.,* subsequent to the stay issued by the Court of Appeals on August 5, 1999, is ill founded."

The State argues that EIP I required pre-kindergarten programs in only a few schools, and that the motive for putting universal pre-kindergarten in EIP II was intertwined with EIP II's improper goal of diminishing performance gaps (rather than ending desegregation). The State also points out that YBE forged ahead with universal pre-kindergarten in FY 2000 after the initial Court of Appeals opinion in *Yonkers VII* was issued on June 2, 1999. The YBE and the City maintain that the shift was permissible because the Monitor found that universal pre-kindergarten would be needed to eliminate desegregation in pre-kindergarten enrollment, and could therefore be included in the EIP I remedy.

Although the shift of universal pre-K funds from EIP II to EIP I raises an initial suspicion, we think the District Court acted within its discretion in adopting, at least for FY 2000, the Monitor's view that the shift did not violate *Yonkers VII*.[10] We cannot be certain that the District Court has adopted the Monitor's view that universal pre-K simply implemented an evolution of EIP I that would have occurred if EIP II had never been ordered and then vacated, and we need not assess such a position unless the District Court endorses it. Nevertheless, the circumstances applicable to FY 2000—the commitments that the YBE had made to pre-K personnel, the date of the State's application for a stay, and the fact that *Yonkers VII* did not finally vacate EIP II until nearly the end of the school year—combine to support the District Court's decision as to that year. In the event that the

---

10. We are mindful of the observation in *Yonkers VII* that programs such as universal pre-K "are more properly characterized as general educational enrichments rather than remedies for prior segregation." 197 F.3d at 56. But that statement was made in the course of ruling that there had not been a sufficient showing that universal pre-K and the other components of EIP II were an appropriate desegregation remedy to be imposed by Court order on Yonkers and the State in an attempt to eliminate vestiges of segregation, which themselves were insufficiently identified. Our issue on this appeal concerns the proper allocation between the City and the State of the expenses of universal pre-K in FY 2000 under the particular circumstances applicable to that year's funding.

Court determines that universal pre-K funds are to be spent beyond FY 2000, it will have to provide an adequate basis for concluding that such a program is either a justified part of EIP I or a justified part of whatever remedy is adopted for the revised vestiges finding.

### Conclusion

In Nos. 99–6128, 99–6132, and 00–6158, the denial of credit for state magnet school aid, for other state categorical aid, for federal magnet school aid, and for federal class size reduction aid is affirmed; in No. 00–6158, the provision of the FY 2000 Funding Order that shifted universal pre-kindergarten costs from EIP II to EIP I is affirmed. In No. 98–6190 (which we regard as independently seeking review only of the Formulaic Funding Order), the appeal and the cross appeal in No. 98–6199 are dismissed, without prejudice to an application to the District Court for revision of the Formulaic Funding Order. The portion of the appeal in No. 99–6132 challenging denial of State credit for EIP II for FY 1999 is dismissed without prejudice to an application to the District Court to consider the State's claim for such credit. The appeal in No. 99–6074 is dismissed as moot, and the District Court is directed to vacate the EIP II Modification Order. Costs to Appellees.